BLANK ROME LLP
Attorneys for Defendant
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DOPMAR S.R.L.,

         Plaintiff,

- against -

BASIC COMMODITIES B.V.,

         Defendant.

08 CIV 5009 (RPP)

---

## DECLARATION OF MEHMET AKYOL

I, MEHMET AKYOL, declare under penalty of perjury:

1.    I am a director of M&M Marine, a shipbroker based in Istanbul.

2.    I submit this declaration based on my personal knowledge of the facts stated herein and in support of a motion to vacate Rule B attachment.

3.    On or about March 25, 2008 as broker for Basic Commodities B.V. ("Basic") I negotiated a contract of charterparty for the use of the M/V LIBERTAS with her owner Dopmar S.r.L. ("Dopmar") through its broker Ralloshipping. I attach a copy as Ex. 1.

M&M MARINE
Ship Management
ISTANBUL
AS BROKER ONLY

130260.00601/6660369v.1

4.    Under the terms of the Charter the Vessel was to carry a sole cargo of cocoa beans in bags (the "Cargo") from Abidjan or San Pedro to a discharge port in the sea of Marmaras, Turkey.

5.    Basic instructed the Vessel to load the cargo at San Pedro, Ivory Coast.

6.    The Vessel arrived at San Pedro and issued its "Notice of Readiness" on March 3, 2008.

7.    The Vessel completed loading and sailed on March 8, 2008.

8.    The voyage from Ivory Coast to Turkey should have taken no more than 29 days.

9.    Dopmar's brokers. "Ralloshipping - Italy," advised me by email dated April 4, 2008 that the Vessel had deviated to the "Tunis Anchorage Area" on March 28, 2008 allegedly because of bad weather. Ex. 2 hereto.

10.    According to a later report from Ralloshipping dated April 22, 2008. Ex. 3 hereto. the bad weather led to:

> . . . discussions held between the vessel/crew and the vessel's managers, there was a situation [of] a great panic/confusion on board due to the heavy weather encountered by the vessel and the health conditions of the Master, who during all the period of bad weather was said to have been greatly stressed. We were advised that the Master and some of the officers/crew on board did not get any sleep for 3 to 4 days."



11.    Basic was not advised by Dopmar or by the "Vessel's Managers" of the "panic/confusion" on board the Vessel until over a month later (Ex. 3). That "panic/confusion" was no doubt caused by the fact that in the middle of the storm the Vessel's main engine failed. (Ex. 3).

12.    Ralloshipping's April 4 email (Ex. 2) failed to reveal the true state of affairs or even mention the Vessel's main engine breakdown.

13.    After further delay. I pressed for information as to the true state of affairs.

14.    Ralloshipping's "Chronology of Events" later explained:

.    On 25/03/2008 afternoon the vessel's Main Engine was reported to have stopped a few times, with the vessel remaining adrift to repair broken cooling pipes fuel injection valve and at 23:00 hrs same day this was resolved with satisfactory results;

.    On 28/03/2008 at about 04.00 Vessel arrived at Malta anchorage in order to disembark the seriously ill Master:

.    On 4 April 2008, the Panama Maritime Authority carried out an Annual Inspection at the port of Valletta (Malta), in accordance with its regulations

.    According to the Medical Report (Valletta, 5/04/2008 Patient: Andryeyev Pavlo), compiled by Dr. M. Rizzo Maudi: "During the voyage at Mediterranean Sea 26, 27 and 28 March 2008, the ship meet very heavy weather. Main engine of ship was out of order. The ship was pitching and rolling heavily, list reach up to 40 dg. and captain Andryeyev Pavlo all this time present on bridge, no rest. Due of high stress, on 28/03/2008 start to feel bad with nausea, left arm and left leg feeling weak, felt that heart is squeezed. Since then he had to rest at bed". Other observations doctor: "This gentleman is unfit to continued with his duties". The Master was said to have suffered from stroke.

3

. On 7/04/2008 Change of Crew. According to "Interim
Survey Endorsement Sheet" (RINA), Place of Survey Off-
Malta: Class confirmed

. On 8/04/2008 whilst leaving Malta, the main engine was
reported to have failed. The cause of this is currently being
investigated.

Call again Rina survey and him need the check of all
equipment on engine from authorized company,

The owner call Wartisila of Genoa (Italy) authorized
company for check main engine and equipment but the
techical can interview on board only on date 18/04/08, we
waiting the report of this company and only after RINA can
give permition and class for departure; Without class
certificate we cannot departure from Malta, in case we see
that spent more time we organize in another way.

Ex. 3 (emphasis added)

15.     Eventually, the Vessel was <u>towed</u> from Malta to Turkey with the Cargo on

board.

16.     While these events were unfolding neither Dopmar nor its broker revealed

the engine breakdowns and true reasons for the Vessel's delay. I ascertained at the time

through reports received via satellite that the Vessel was anchored somewhere between

Sicily and Malta. Another satellite report revealed that the ship was moved between

Sicily and Malta.

17.     Whilst the Vessel was around Malta, I learnt that 10 or 11 crew had left the

Vessel.

18.     I also requested Ralloshipping to check the cargo.   Ralloshipping

continuously said that the cargo remaining in good condition.

4

13026000601/6660169v.1

19.   The Vessel issued her "Notice of Readiness" at Ambarli, Bay of Marmaras.

Turkey on May 6, 2008.

20.   A voyage that should have taken 29-30 days took 59 days.

21.   Cargo receivers arrested the Vessel pursuant to a "precautionary judgment"

issued by the "Istanbul Admiralty Court." (Wolfson Dec. Ex. 5) (the "Turkish

Judgment").

22.   The Turkish Judgment, as translated by Dopmar, was premised on assertion

by the cargo interests as follows:

> The attorney of the party requested precautionary judgment
> declared in his petition that the cargo of 3,879,677.-tons
> cacao beans was carried under B/L by the opposing party the
> owner from San Pedro Port/Ivory Coast to any port in
> Marmara Sea, the loading operations completed on
> 08.03.2008 and vessel sailed as loaded same day, although
> the estimated time of arrival of the vessel for discharging was
> determined prior to commencement of voyage clear ETA and
> additionally clear information in respect of the events
> happened relating to the vessel was not given by the owner,
> as per the owner's allegation the vessel could not continue to
> her voyage due to engine breakdown, the vessel was tugged
> by a tugboat to Turkish waters and agricultural disinfectant
> was applied to the vessel therefore the vessel berthed at
> Ambarli Port for discharging only on 14.05.2008, upon the
> risk of damage to the cargo is likely expert determination was
> carried under file number 2008/192 D.İş of Buyukcekmece 3.
> Court of First Instance, expert report was submitted to the
> file, according the expert report the loss suffered by his
> clients the cargo owners was at very high rate, and requested
> that arrest order to be issued on the vessel LIBERTAS by
> declaring that the vessel should be arrested since the opposing
> party was foreigner and the vessel was foreign flagged and in
> order to provide his clients to be compensated for the los
> suffered by them.

130260 0060146690169; 1

5

23.    I declare under penalty of perjury of the laws of the United States that the

foregoing is true and correct.

MEHMET AKYOL



Executed on August 08, 2008
at Istanbul, Turkey

6

# EXHIBIT 1

REF TO TELCON, WHICH PLS HERE BELOW CLEAN FIXTURE RECAP.


ALL SUBS LIFTED   THE SHIP CLEAN FIXED


M/V "LIBERTAS"
SINGLEDECKER - GENERAL CARGO
- BUILT: 1985
- FLAG: PANAMA
- LOA:    111.30  M
  BEAM:    17.04  M
  DRFT:     7.027 M
- GRT /NRT:  4433/2618
  suez grt / nrt :4682.08/3705.38
  panama grt / nrt :5343.57/4343.69
- dwt / draft
  summer :7.278.38/7.027 m free board from deck:1993mm
  tpc :15.1
  displacement loaded : mt 9.389 m/tons
- TYPE OF HATCH COVERS: MCGREGOR SINGLE PULL TYPE
- NUMBERS HOLDS / HATCHES: 3 / 3
- HOLD CAPACITY:NO          GRAIN                    BALE
                --     --------------          ----------------
                1)    2430 CBM /  85735 CBFT   2230.94 CBM /  78704 CBFT
                2)    3885 CBM / 137310 CBFT   3633.35 CBM / 128311 CBFT
                3)    3437 CBM / 121389 CBFT   3169.43 CBM / 111921 CBFT
- HOLD DIMENSION:  HOLD  n°-1: 20.80 x 11.75 x 7.30 mt
                   HOLD  n°-2: 27.30 x 15.90 x 7.30 mt
                   HOLD  n°-3: 24.70 x 15.55 x 7.30 mt
- HATCH DIMENSION: HATCH n°-1: 13.00 x 10.60 mt
                   HATCH n°-2: 19.50 x 10.60 mt
                   HATCH n°-3: 19.50 x 10.60 mt
- hatch coaming heights :1.2 mtr
- tank tops : 6.5
- fuel capacity :324.7 mt
  gas oil capacity :99.57 mt
  fw capacity :136 mt
- holds co2 fitted :yes
- SPEED LADEN/BALLAST ABT 10/10.5 KNTS
- CONSUPTION ABT 9.5 MT IFO 80 + ABT 1 MT MDO (MGO)
- cargo gear :3 hydrolift cranes/SWL-6/8/12
- OUTREACH BASIS 10 mt, LIFTING 9 mt EITHER P/SIDE AND S/SIDE
- TURN CYCLE 5/6 min DIPEND FROM SKILFULNESS OF CERTIFIED CRANE OPERATOR
- holds electric ventilated :yes

- VSL'S PRESENT POSITION / ITINERARY. -

FOR,
- ALL SUBS IN ORDER, VSL FULLY FIXED
- ACCT BASIC COMMODITIES - AMSTERDAM  NETHERLAND
- CGO MIN 3500 UPTO FULL CARGO CAPACITY IN CHOPT OF COCOA BEANS IN BAGS STW ABT 82/84'
- SOLE CARGO
- ABIDJAN OR SAN PEDRO/ MARMARA   1GSPB AA BENDS
- IN ANYCASE OWNER ACKNOWLEDGE EACH PORT AS SAFE/SUITABLE FOR THIS VESSEL
- LAYCAN 3rd MARCH 2008
- FREIGHT : USD. 440.000 LSUM FIOS BSS 1/1
  ADDITIONAL PAYMENT USD 2500.-
  ITALYAN BROKER MR FRANCESCO  RALLO SHIPPING  TO BE TRANSFERRED
- FRT PAYABLE 100% LESS COMM ONLY INTO CARRIERS NOMINATED BANK ACCNT W/IN 6 BDAYS AFT
  SIGN B/L MARKED  ''CLEAN ON BOARD''/  "FRT PAYABLE AS PER B/N". CHOPT FREIGHT PREPAID
IN LATTER  THE BS/L WILL NOT RELEASED UNTIL OWNER RECEIVE CHRTS BANK SWIFT
- PAYMENT TO BE EFFECT FROM CHARTERER DIRECTLY (NOT VIA BROKER OFFICE )
- SHOULD THE ORIGINAL B/L ARE NOT READY UPON VESSEL ARRIVAL, OWNERS TO DISCHARGE CARGO
AGAINST MERCHANTS  LOI ON A USUAL P&I FORM.
- L/D 8.5 TTL DAY SSHEX EIU BENDS TIME COUNTING 14/08 CLS
- DEMURRAGE USD 7.200 PDPR/FD BENDS
- DEM IF ANY TO BE SETTLE W/IN 10 DAY AFTER COMPLETION OF THE SHIPMENT

CUMA YA KADAR VAKTIMIZ VAR
ORADA EN TECRUBELI VE BIZI EN COK LAFIMIZI DINLEYEN   ACENTAYI TAYIN EDERIZ
CHARTS AGENTS AT LOADPORT - AFRITRAMP Abidjan
Tel : +225 21.22.00.00 / DL  : +225 21.22.03.41Cel : +225 07.69.00.37 / Fax : +225 21.22.03.93
Internet mail : olivier.sou@ci.dti.bollore.com

-TAHLIYEDE KIRACI ACENTASI
 BERABER BURADA DEVREYE GIRECEGIZ
 VE EN ETKILI ACENTAYI  TAYIN EDECEGIZ
 TAYIN HAKKI KIRACIDA BIZLERDEDIR
 CHARTS AGENT AT DISCH PORT - WILL REVERT (NO SUBS)
-TAXES/DUES ON CARGO/FREIGHT, IF ANY, FOR CHARTS ACCT
-TAXES/DUES ON VSL, IF ANY FOR OWS ACCT
-IF ANY  FUMIGATION NEEDED AT LOADING PORT THE SAME WILL BE CHRTS ACCOUNT
-DUNNAGE A/O KRAFT PAPER A/O PLAYWOOD FOR CARGO PROTECTION IN HOLD FOR CHARTS' ACCT
-OWNERS TO PRESENT VESSEL IN A GOOD CONDITION TO CARRY C/P CARGO. THE SHIP AND HOLDS ARE
 WILL BE READY  CLEAN - DRY AND READY FOR LOADING IF VESSEL IS REFUSED DUE TO
 PROVEN EVIDENTS BY THE SHIPPERS THAT THE HOLDS ARE NOT ACCEPTABLE TO LOAD THE CARGO
 OWNERS TO TAKE NECESSARY STEPS TO PREPARE VESSEL AT THEIR COST AND TIME.
-MASTER/OWNERS TO GIVE  7   DAYS 48/24/12 HRS FOR CGO READINESS BY SHIPPER/CHRS
-OWNER NOT RESPONSIBLE FOR EXTRA INSURANCE WHICH WILL BE FOR CHRTS ACCT
-GA / ARB IN LONDON ENGLISH LAW
-OTHERWISE MERCHANTS B/N
-CARGO GEAR CLAUSE TO BE READ AS FOLLOWS :
 BU MADDE COK GUZEL VE LEHIMIZEDIR -GEMI VINCLERI MADDESI
 AT LOADPORT / DISPORT :
 VESSEL IS EQUIPPED WITH THE FOLLOWING CARGO HANDLING GEAR AS PER HER DESCRIPTION
 IN GOOD   WORKING ORDER, WHICH ARE AT MERCHANT'S FREE DISPOSAL,
 WHENEVER REQUIRED, TOGETHER WITH CORRESPONDING RUNNING GEAR AND WITH THE NECESSARY
 MOTIVE POWER TO WORKALL GEAR SIMULTANEOUSLY. ANY TIME LOST AS A RESULT OF VESSEL'S
 POWER FAILURE, BREAKDOWN OF WINCHES/VESSEL'S CRANES AND/OR GEAR SHALL NOT COUNT AS
 LAYTIME.
END

MANY THANKS FOR YR COOPERATION AND SUPPORT IN THIS FIXTURE.

BEST REGARDS
M&M MARINE - IST

| Agents (full style and address) | BIMCO LINER BOOKING NOTE<br>CODE NAME: "CONLINEBOOKING 2000" |
|---|---|
| | Place and date |
| | Vessel |
| Carrier (full style and address) | Time for shipment (about) |
| | Port of loading |
| | Port of discharge |
| Merchant* (full style and address) | Merchant's representatives at loading port (full style and address) |

| Container Nos./Seal Nos./Marks and Nos. | Number and kind of packages; description of goods<br>(Cl. 13(a)(i)) | | Gross weight, kg<br>(Cl. 13(a)(ii)) | Measurement, m³<br>(Cl. 13(a)(iii)) |
|---|---|---|---|---|
| | | | | |

| Freight details and charges | Special terms, if agreed |
|---|---|
| | Additional clauses .. until and including..are fully incorporated in this Booking Note |
| Freight (state prepayable or payable at destination) | |

It is hereby agreed that this Contract shall be performed subject to the terms contained on Page 1 and 2 hereof which shall prevail over any previous arrangements and which shall in turn be superseded (except as to deadfreight) by the terms of the Bill of Lading.

| Signature (Merchant) | Signature (Carrier) |
|---|---|
| | |

The Baltic and International Maritime Council (BIMCO), Copenhagen, 2000
Copyright, published by

*As defined hereinafter (Cl. 1)
*(or agreed thereinafter as the Vessel may safely get and lie always afloat)

This document is a computer generated CONLINEBOOKING 2000 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# FULL TERMS OF THE CARRIER'S BILL OF LADING FORM*
Page 2

**1. Definition.**
"Merchant" includes the shipper, the receiver, the consignor, the consignee, the holder of the Bill of Lading, the owner of the cargo and any person entitled to possession of the cargo.

**2. Notification.**
Any mention in this Bill of Lading of parties to be notified of the arrival of the cargo is solely for the information of the Carrier and failure to give such notification shall not involve the Carrier in any liability nor relieve the Merchant of any obligation hereunder.

**3. Liability for Carriage Between Port of Loading and Port of Discharge.**
(a) The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Pro-tocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespec-tive of whether such legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or, if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract. The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or with respect to deck cargo and live animals.

(b) If the Carrier is held liable in respect of delay, consequen-tial loss or damage other than loss of or damage to the cargo, the liability of the Carrier shall be limited to the freight for the carriage covered by this Bill of Lading, or to the limitation amount as determined in sub-clause 3(a), whichever is the lesser.

(c) The aggregate liability of the Carrier and/or any of his servants, agents or independent contractors under this Contract shall, in no circumstances, exceed the limits of liability for the total loss of the cargo under sub-clause 3(a) or, if applicable, the Additional Clause.

**4. Law and Jurisdiction.**
Disputes arising out of or in connection with this Bill of Lading shall be exclusively determined by the courts and in accor-dance with the law of the place where the Carrier has his prin-cipal place of business as stated on Page 1, except as pro-vided elsewhere herein.

**5. The Scope of Carriage.**
The intended carriage shall not be limited to the direct route but shall be deemed to include any proceeding or returning to or stopping or slowing down at or off any ports or places for any reasonable purpose connected with the carriage including bunkering, loading, discharging, or other cargo operations and maintenance of Vessel and crew.

**6. Substitution of Vessel.**
The Carrier shall be at liberty to carry the cargo or part thereof to the Port of discharge by the said or other vessel or vessels either belonging to the Carrier or others, or by other means of transport, proceeding either directly or indirectly to such port.

**7. Transhipment.**
The Carrier shall be at liberty to tranship, lighter, land and store the cargo either on shore or afloat and re-ship and forward the same to the Port of discharge.

**8. Liability for Pre- and On-Carriage.**
When the Carrier arranges pre-carriage of the cargo from a place other than the Vessel's Port of loading or on-carriage of the cargo to a place other than the Vessel's Port of discharge, the Carrier shall contract as the Merchant's Agent only and the Carrier shall not be liable for any loss or damage arising during any part of the carriage other than between the Port of loading and the Port of discharge even though the freight for the whole carriage has been collected by him.

**9. Loading and Discharging.**
(a) Loading and discharging of the cargo shall be arranged by the Carrier or his Agent.

(b) The Merchant shall, at his risk and expense, handle and/or store the cargo before loading and after discharging to place of rest in the terminal shed.

(c) Loading and discharging may commence without prior notice.

(d) The Merchant or his Agent shall tender the cargo when the Vessel is ready to load and as fast as the Vessel can receive including, if required by the Carrier, outside ordinary working hours notwithstanding any custom of the port. If the Merchant or his Agent fails to tender the cargo when the Vessel is ready to load and as fast as the Vessel can receive the cargo, the Carrier shall be relieved of any obligation to load such cargo; the Vessel shall be entitled to leave the port without further notice and the Merchant shall be liable to the Carrier for deadfreight and/or any overtime charges, losses, costs and expenses incurred by the Carrier.

(e) The Merchant or his Agent shall take delivery of the cargo as fast as the Vessel can discharge including, if required by the Carrier, outside ordinary working hours notwithstanding any custom of the port. If the Merchant or his Agent fails to take delivery of the cargo the Carrier's discharging of the cargo shall be deemed fulfilment of the contract of carriage. Should the cargo not be applied for within a reasonable time, the Carrier may sell the same privately or by auction. If the Merchant or his Agent fails to take delivery of the cargo as fast as the Vessel can discharge the Merchant shall be liable to the Carrier for any overtime charges, losses, costs and expenses incurred by the Carrier.

(f) The Merchant shall accept his reasonable proportion of unidentified loose cargo.

**10. Freight, Charges, Costs, Expenses, Duties, Taxes and Fines.**

(a) Freight, whether paid or not, shall be considered as fully earned upon loading and non-returnable in any event. Unless otherwise specified, freight and/or charges under this Contract are payable by the Merchant to the Carrier on demand. Interest at Libor (or its successor) plus 2 per cent. shall run from fourteen days after the date when freight and charges are payable.

(b) The Merchant shall be liable for all costs and expenses of fumigation, gathering and sorting loose cargo and Weighing onboard, repairing damage to and replacing packing due to excepted causes and any extra handling of the cargo for any of the aforementioned reasons.

(c) The Merchant has been liable for any dues, duties, taxes and charges which under any denomination may be levied, inter alia, on the basis of freight, weight of cargo or tonnage of the Vessel.

(d) The Merchant shall be liable for all fines, penalties, costs expenses and losses which the Carrier, Vessel or cargo may incur through non-observance of Customs House and/or Import or export regulations.

(e) The Carrier is entitled in case of incorrect declaration of contents, weight, measurements or value of the cargo to claim double the amount of freight which would have been due if such declaration had been correctly given. For the purpose of ascertaining the actual facts, the Carrier shall have the right to obtain from the Merchant the original invoice and to have the cargo inspected and its contents, weight, measurement or value verified.

**11. Lien.**
The Carrier shall have a lien on all cargo for any amount due under this contract and the costs of recovering the same and shall be entitled to sell the cargo privately or by auction to satisfy any such claims.

**12. General Average and Salvage.**
General Average shall be adjusted, stated and settled in London Amsterdam according to the York-Antwerp Rules 1994, or any modification thereof, in respect of all cargo, whether carried on or under deck. In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Carrier is not responsible by statute, contract or otherwise, the Merchant shall contribute with the Carrier in General Average to the payment of any sacrifice, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the salving vessel or vessels belonged to strangers.

**13. Both-to-Blame Collision Clause.**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, negligence or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the Merchant will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her Owner in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owner of the cargo paid or payable by the other or non-carrying vessel or her Owner to the owner of the cargo and set-off, recouped or recovered by the other or non-carrying vessel or her Owner as part of his claim against the carrying vessel or Carrier. The foregoing provisions shall also apply where the Owner, operator or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

**14. Government directions, War, Epidemics, Ice, Strikes,** etc.

(a) The Master and the Carrier shall have liberty to comply with any order or directions or recommendations in connec-tion with the carriage under this Contract given by any Government or Authority, or anybody acting or purporting to act on behalf of such Government or Authority, or having under the terms of the insurance on the Vessel the right to give such orders or directions or recommendations.

(b) Should it appear that the performance of the carriage would expose the Vessel or any cargo onboard to risk of seizure, damage or delay, in consequence of war, warlike operations, blockade, riots, civil commotions or piracy, or any person onboard to risk of loss of life or freedom, or that any such risk has increased, the Master may discharge the cargo at the Port of loading or any other safe and convenient port.

(c) Should it appear that epidemics; quarantine; ice; labour troubles, labour obstructions, strikes, lockouts (whether onboard or on shore); difficulties in loading or discharging would prevent the Vessel from leaving the Port of loading or reaching or entering the Port of discharge or there discharging in the usual manner and departing therefrom, all of which safely and without unreasonable delay, the Master may discharge the cargo at the Port of loading or any other safe and convenient port or any other safe, convenient and mutually agreeable port/terminal suitable for the handling and storage of the cargo.

(d) The discharge under the provisions of this Clause, of any cargo shall be deemed due fulfilment of the contract of car-riage.

(e) If in connection with the exercise of any liberty under this Clause any extra expenses are incurred they shall be paid by the Merchant in addition to the freight, together with return freight, if any, and a reasonable compensation for any extra services rendered to the cargo.

**15. Defences and Limits of Liability for the Carrier, Servants and Agents.**
(a) It is hereby expressly agreed that no servant or agent of the Carrier (which for the purpose of this Clause includes every independent contractor from time to time employed by the Carrier) shall in any circumstances whatsoever be under any liability whatsoever to the Merchant under this Contract of car-riage for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment.

(b) Without prejudice to the generality of the foregoing provi-sions in this Clause, every exemption from liability, limitation condition and liberty herein contained and every right, defence and immunity of whatsoever nature applicable to the Carrier or to which the Carrier is entitled, shall also be available and shall extend to protect every such servant and agent of the Carrier acting as aforesaid.

(c) The Merchant undertakes that no claim shall be made against any servant or agent of the Carrier and, if any claim should nevertheless be made, to indemnify the Carrier against all consequences thereof.

(d) For the purpose of all the foregoing provisions of this Clause the Carrier is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who might be his servants or agents from time to time and all such per-sons shall to this extent be or be deemed to be parties to this Contract of carriage.

**16. Stowage.**
(a) The Carrier shall have the right to stow cargo by means of containers, trailers, transportable tanks, flats, pallets, or similar articles of transport used to consolidate goods.

(b) The Carrier shall have the right to carry containers, trailers, transportable tanks and covered flats, whether stowed by the Carrier or received by him in a stowed condition from the Mer-chant, on or under deck without notice to the Merchant.

**17. Shipper-Packed Containers, trailers, transportable tanks, flats and pallets.**
(a) If a container has not been filled, packed or stowed by the Carrier, the Carrier shall not be liable for any loss of or damage to its contents and the Merchant shall cover any loss or expense incurred by the Carrier, if such loss, damage or expense has been caused by:
(i) negligent filling, packing or stowing of the container;
(ii) the contents being unsuitable for carriage in container; or
(iii) the unsuitability or defective condition of the container unless the container has been supplied by the Carrier and the unsuitability or defective condition would not have been ap-parent upon reasonable inspection at or prior to the time when the container was filled, packed or stowed.

(b) The provisions of sub-clause (i) of this Clause also apply with respect to trailers, transportable tanks, flats and pallets which have not been filled, packed or stowed by the Carrier.

(c) The Carrier does not accept liability for damage due to the unsuitability or defective condition of reefer equipment or trailers supplied by the Merchant.

**18. Return of Containers.**
(a) Containers, pallets or similar articles of transport supplied by or on behalf of the Carrier shall be returned to the Carrier in the same order and condition as handed over to the Merchant, normal wear and tear excepted, with interiors clean and within the time prescribed in the Carrier's tariff or elsewhere.

(b) The Merchant shall be liable to the Carrier for any loss, damage to, or delay, including demurrage and detention incurred by or sustained to containers, pallets or similar articles of transport during the period between handing-over to the Merchant and return to the Carrier.

**ADDITIONAL CLAUSE**
**U.S. Trade. Period of Responsibility.**
(i) In case the Contract evidenced by this Bill of Lading is sub-ject to the Carriage of Goods by Sea Act of the United States of America, 1936 (U.S. COGSA), then the provisions stated in said Act shall govern before loading and after discharge and throughout the entire time the cargo is in the Carrier's custody and in which event freight shall be payable on the cargo coming into the Carrier's custody.

(ii) If the U.S. COGSA applies, and unless the nature and value of the cargo has been declared by the shipper before the cargo has been handed over to the Carrier and inserted in this Bill of Lading, the Carrier shall in no event be or become liable for any loss or damage to the cargo in an amount exceeding USD 500 per package or customary freight unit.

---

\*BIMCO LINER BILL OF LADING
Code Name: "Conlinebill 2000"
Amended January 1950; August 1952; January 1973; July 1974; August 1976; January 1978; November 2000

24. Lien

The Carrier shall have a lien on the cargo for freight and dead-freight only.

The value of the cargo on which the Carrier exercises a lien shall not exceed the amount of the unpaid freight and/or dead-freight.

The value of the cargo shall be based on the Merchant's purchase invoice of the cargo.

25. Time for shipment

Should the vessel not be ready to load (whether in berth or not) on or before the final days of laycan, Merchants have the option of cancelling this contract. In case vessel is delayed and unable to be ready to load until the agreed cancelling date the Carrier will inform the Merchant accordingly and the Merchant to declare latest within 1 working day after receipt of Carrier's notice whether to cancel the contract or whether they extend the cancelling date to the date as requested by the Carrier. In case of no reply within the above mentioned time limit, it is agreed that the cancelling date has been extended, but only if the new cancelling date will not be later than 4 days after the initially agreed cancelling date.

26. Stowage

The cargo is to be loaded under deck, cool and away from heat and in unobstructed main compartments only.

27. Rotation

The vessel is to sail directly from the cocoa load port to the cocoa discharge port.

28. Origin/Destination Clause

The Carrier warrants that the vessel is in all respects eligible for trading to the ports, places or countries and that at all necessary times the vessel and/or the Carrier shall have all valid certificates, records or other documents required for such trade.

29. Suitability

The Carrier warrants that the vessel is fully and in every way fitted and suitable for the carriage of cocoa beans in bags. All compartments are to be clean, dry, free from insects and other vermin, loose rust and scale, smell and in a fit and proper state. The cargo is to be loaded under deck, cool and away from heat and in unobstructed main compartments only. If the vessel fails inspection the Carrier is to expedite cleaning in order to have the vessel clean and loadready at the earliest moment. The Carrier shall use all possible means to make the vessel clean; including, but not limited to, the hiring of shore labour and/or equipment at their expense. The Carrier shall be liable for all costs and expenses of fumigation of the vessel.

### 30. ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Booking Note, the Carrier shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Carrier shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Merchant. Except as otherwise provided in this Booking Note, loss, damage, expense or delay caused by failure on the part of the Carrier or "the Company" to comply with the ISM Code shall be for the Carrier's account.

### 31. Hatch clause

The vessel's hatches have to be watertight with rubbers and seals in place and the vessel to be in every respect in seaworthy condition and suitable to load the cargo contracted. The Carrier is to ensure that all prudent measures are taken to maintain the watertight integrity of the hatches, including, if necessary, caulking and taping hatches.

### 32. Ventilation

The Master is to operate the vessel's ventilation to minimise condensation.

### 33. Packing

The Carrier is responsible for all leak, slack, torn, wet, stained -even if dry- and discoloured - even if dry- bags.
The Carrier is to refuse to load for shipment any bag in the following condition(s):

-leak
-slack
-torn
-wet
-stained, even if dry
-discoloured, even if dry
-bags with residues of pesticides

Any bag in the above condition(s) is to be replaced with a bag in sound condition by the supplier

### 34. Tally

The Carrier is responsible for the outturn tally. The Carrier is responsible for the outturn of exactly the number of bags reflected in the Bills of Lading.

### 35. Loading and Discharge

The cargo is to be loaded and discharged in Bill of Lading lots.

24. Lien

The Carrier shall have a lien on the cargo for freight and dead-freight only.

The value of the cargo on which the Carrier exercises a lien shall not exceed the amount of the unpaid freight and/or dead-freight.

The value of the cargo shall be based on the Merchant's purchase invoice of the cargo.

25. Time for shipment

Should the vessel not be ready to load (whether in berth or not) on or before the final days of laycan, Merchants have the option of cancelling this contract. In case vessel is delayed and unable to be ready to load until the agreed cancelling date the Carrier will inform the Merchant accordingly and the Merchant to declare latest within 1 working day after receipt of Carrier's notice whether to cancel the contract or whether they extend the cancelling date to the date as requested by the Carrier. In case of no reply within the above mentioned time limit, it is agreed that the cancelling date has been extended, but only if the new cancelling date will not be later than 4 days after the initially agreed cancelling date.

26. Stowage

The cargo is to be loaded under deck, cool and away from heat and in unobstructed main compartments only.

27. Rotation

The vessel is to sail directly from the cocoa load port to the cocoa discharge port.

28. Origin/Destination Clause

The Carrier warrants that the vessel is in all respects eligible for trading to the ports, places or countries and that at all necessary times the vessel and/or the Carrier shall have all valid certificates, records or other documents required for such trade.

29. Suitability

The Carrier warrants that the vessel is fully and in every way fitted and suitable for the carriage of cocoa beans in bags. All compartments are to be clean, dry, free from insects and other vermin, loose rust and scale, smell and in a fit and proper state. The cargo is to be loaded under deck, cool and away from heat and in unobstructed main compartments only. If the vessel fails inspection the Carrier is to expedite cleaning in order to have the vessel clean and loadready at the earliest moment. The Carrier shall use all possible means to make the vessel clean, including, but not limited to, the hiring of shore labour and/or equipment at their expense. The Carrier shall be liable for all costs and expenses of fumigation of the vessel.

### 36. Discharge/Delivery

The Carrier is to discharge/deliver the cargo against presentation of at least 1/3 original Bill of Lading only.

In case the receiver and/or their agents are not able to present the original Bill(s) of Lading before commencement of discharge/delivery, then only Continaf B.V. could authorise the Carrier to discharge/deliver the cargo without production of the original Bill(s) of Lading.

### 37. Notice clause

The Carrier/Master to give Merchants 10/7/5/3/2/1 days notice of vessel's estimated time of arrival at loading and discharge port(s). On sailing the Carrier/Master is to advise the Merchants of the quantity loaded, the sailing time and the estimated time of arrival at the discharge port(s).

### 36. Seaworthy trim

The Carrier warrants the vessel is able to safely sail between the loading/discharging berth(s)/anchorage(s)/port(s).

### 39. Taxes and/or dues

Any taxes and/or dues on vessel and/or flag and/or crew to be for the Carrier's account. Any taxes and/or dues on cargo and/or freight to be for the Merchant's account.

### 40. Loading Operations, Weather and Temperature reports

The Master is to complete the Loading Operations, Weather and Temperature reports. These 3 reports, duly signed and stamped by the Master, are to be presented to the Merchant.

### 41. Confidentiality

The terms of this contract are to remain strictly private and confidential and are not under any circumstances to be divulged by either party hereto to any third party(ies) whatsoever.

However, in the event of a demand for information or documents being made by any Government Department, Authority of other Statutory Agency, either party is allowed to comply with such demand.



Additional clauses to "Conlinebooking 2000" Liner Booking Note - cocoa beans, bags, sole cargo

page 4 of 5
15-02-08

24. Lien

The Carrier shall have a lien on the cargo for freight and dead-freight only.

The value of the cargo on which the Carrier exercises a lien shall not exceed the amount of the unpaid freight and/or dead-freight.

The value of the cargo shall be based on the Merchant's purchase invoice of the cargo.

25. Time for shipment

Should the vessel not be ready to load (whether in berth or not) on or before the final days of laycan, Merchants have the option of cancelling this contract. In case vessel is delayed and unable to be ready to load until the agreed cancelling date the Carrier will inform the Merchant accordingly and the Merchant to declare latest within 1 working day after receipt of Carrier's notice whether to cancel the contract or whether they extend the cancelling date to the date as requested by the Carrier. In case of no reply within the above mentioned time limit, it is agreed that the cancelling date has been extended, but only if the new cancelling date will not be later than 4 days after the initially agreed cancelling date.

26. Stowage

The cargo is to be loaded under deck, cool and away from heat and in unobstructed main compartments only.

27. Rotation

The vessel is to sail directly from the cocoa load port to the cocoa discharge port.

28. Origin/Destination Clause

The Carrier warrants that the vessel is in all respects eligible for trading to the ports, places or countries and that at all necessary times the vessel and/or the Carrier shall have all valid certificates, records or other documents required for such trade.

29. Suitability

The Carrier warrants that the vessel is fully and in every way fitted and suitable for the carriage of cocoa beans in bags. All compartments are to be clean, dry, free from insects and other vermin, loose rust and scale, smell and in a fit and proper state. The cargo is to be loaded under deck, cool and away from heat and in unobstructed main compartments only. If the vessel fails inspection the Carrier is to expedite cleaning in order to have the vessel clean and loadready at the earliest moment. The Carrier shall use all possible means to make the vessel clean; including, but not limited to, the hiring of shore labour and/or equipment at their expense. The Carrier shall be liable for all costs and expenses of fumigation of the vessel.



## 30. ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Booking Note, the Carrier shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Carrier shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Merchant. Except as otherwise provided in this Booking Note, loss, damage, expense or delay caused by failure on the part of the Carrier or "the Company" to comply with the ISM Code shall be for the Carrier's account.

## 31. Hatch clause

The vessel's hatches have to be watertight with rubbers and seals in place and the vessel to be in every respect in seaworthy condition and suitable to load the cargo contracted. The Carrier is to ensure that all prudent measures are taken to maintain the watertight integrity of the hatches, including, if necessary, caulking and taping hatches.

## 32. Ventilation

The Master is to operate the vessel's ventilation to minimise condensation.

## 33. Packing

The Carrier is responsible for all leak, slack, torn, wet, stained -even if dry- and discoloured - even if dry- bags.
The Carrier is to refuse to load for shipment any bag in the following condition(s):

-leak
-slack
-torn
-wet
-stained, even if dry
-discoloured, even if dry
-bags with residues of pesticides

Any bag in the above condition(s) is to be replaced with a bag in sound condition by the supplier

## 34. Tally

The Carrier is responsible for the outturn tally. The Carrier is responsible for the outturn of exactly the number of bags reflected in the Bills of Lading.

## 35. Loading and Discharge

The cargo is to be loaded and discharged in Bill of Lading lots.

## 42. ISPS/MTSA CLAUSE FOR VOYAGE CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

(ii) Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

(d) Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party

24. Lien

The Carrier shall have a lien on the cargo for freight and dead-freight only.

The value of the cargo on which the Carrier exercises a lien shall not exceed the amount of the unpaid freight and/or dead-freight.

The value of the cargo shall be based on the Merchant's purchase invoice of the cargo.

25. Time for shipment

Should the vessel not be ready to load (whether in berth or not) on or before the final days of laycan, Merchants have the option of cancelling this contract. In case vessel is delayed and unable to be ready to load until the agreed cancelling date the Carrier will inform the Merchant accordingly and the Merchant to declare latest within 1 working day after receipt of Carrier's notice whether to cancel the contract or whether they extend the cancelling date to the date as requested by the Carrier. In case of no reply within the above mentioned time limit, it is agreed that the cancelling date has been extended, but only if the new cancelling date will not be later than 4 days after the initially agreed cancelling date.

26. Stowage

The cargo is to be loaded under deck, cool and away from heat and in unobstructed main compartments only.

27. Rotation

The vessel is to sail directly from the cocoa load port to the cocoa discharge port.

28. Origin/Destination Clause

The Carrier warrants that the vessel is in all respects eligible for trading to the ports, places or countries and that at all necessary times the vessel and/or the Carrier shall have all valid certificates, records or other documents required for such trade.

29. Suitability

The Carrier warrants that the vessel is fully and in every way fitted and suitable for the carriage of cocoa beans in bags. All compartments are to be clean, dry, free from insects and other vermin, loose rust and scale, smell and in a fit and proper state. The cargo is to be loaded under deck, cool and away from heat and in unobstructed main compartments only. If the vessel fails inspection the Carrier is to expedite cleaning in order to have the vessel clean and loadready at the earliest moment. The Carrier shall use all possible means to make the vessel clean, including, but not limited to, the hiring of shore labour and/or equipment at their expense. The Carrier shall be liable for all costs and expenses of fumigation of the vessel.



Additional clauses to 'Conlinebooking 2000' Liner Booking Note - cocoa beans, bags, sole cargo

### 30. ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Booking Note, the Carrier shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Carrier shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Merchant. Except as otherwise provided in this Booking Note, loss, damage, expense or delay caused by failure on the part of the Carrier or "the Company" to comply with the ISM Code shall be for the Carrier's account.

### 31. Hatch clause

The vessel's hatches have to be watertight with rubbers and seals in place and the vessel to be in every respect in seaworthy condition and suitable to load the cargo contracted. The Carrier is to ensure that all prudent measures are taken to maintain the watertight integrity of the hatches, including, if necessary, caulking and taping hatches.

### 32. Ventilation

The Master is to operate the vessel's ventilation to minimise condensation.

### 33. Packing

The Carrier is responsible for all leak, slack, torn, wet, stained -even if dry- and discoloured - even if dry- bags.
The Carrier is to refuse to load for shipment any bag in the following condition(s):

-leak
-slack
-torn
-wet
-stained, even if dry
-discoloured, even if dry
-bags with residues of pesticides

Any bag in the above condition(s) is to be replaced with a bag in sound condition by the supplier

### 34. Tally

The Carrier is responsible for the outturn tally. The Carrier is responsible for the outturn of exactly the number of bags reflected in the Bills of Lading.

### 35. Loading and Discharge

The cargo is to be loaded and discharged in Bill of Lading lots.

Additional clauses to "Conlinebooking 2000" Liner Booking Note - cocoa beans, bags, sole cargo

### 36. Discharge/Delivery

The Carrier is to discharge/deliver the cargo against presentation of at least 1/3 original Bill of Lading only.

In case the receiver and/or their agents are not able to present the original Bill(s) of Lading before commencement of discharge/delivery, then only Continaf B.V. could authorise the Carrier to discharge/deliver the cargo without production of the original Bill(s) of Lading.

### 37. Notice clause

The Carrier/Master to give Merchants 10/7/5/3/2/1 days notice of vessel's estimated time of arrival at loading and discharge port(s). On sailing the Carrier/Master is to advise the Merchants of the quantity loaded, the sailing time and the estimated time of arrival at the discharge port(s).

### 38. Seaworthy trim

The Carrier warrants the vessel is able to safely sail between the loading/discharging berth(s)/anchorage(s)/port(s).

### 39. Taxes and/or dues

Any taxes and/or dues on vessel and/or flag and/or crew to be for the Carrier's account. Any taxes and/or dues on cargo and/or freight to be for the Merchant's account.

### 40. Loading Operations, Weather and Temperature reports

The Master is to complete the Loading Operations, Weather and Temperature reports. These 3 reports, duly signed and stamped by the Master, are to be presented to the Merchant.

### 41. Confidentiality

The terms of this contract are to remain strictly private and confidential and are not under any circumstances to be divulged by either party hereto to any third party(ies) whatsoever.

However, in the event of a demand for information or documents being made by any Government Department, Authority of other Statutory Agency, either party is allowed to comply with such demand.



Additional clauses to "Conlinebooking 2000" Liner Booking Note - cocoa beans, bags, sole cargo      page 4 of 5
                                                                                                    15-02-08



| | NOTICE OF READINESS | SHIPTECH SRL NAPLES - ITALY |

Please note that the ship: m/v L I B E R T A S

Nationality: PANAMA

Call Sign: 3 EAV

arrived under my command at the port of  San Pedro

on ...23 February  2008    at ... 06.00 hrs. UTC

and is ready in all respect to commence load a cargo of  Cocoa Beans in bags

in accordance with the terms, supplements, deletions and exceptions of the

Charter Party dated .................................................................................................

If it is intended to commence  load the cargo earlier than named in the

Charter Part, time is to count from the time of actual beginning.

NOR TENDERED BY E-MAIL ON ...23  february  2008  AT ...09.50...... hrs LT

Place: P. San Pedro........  Date: 04 03 2008......Hour: ...................LT

AS PER C/P.

SDV-SAGA-COTE D'IVOIRE
SHIPPING - DEPARTMENT
B.P. 369.SAN PEDRO
Charters/Shipper/Consignes

Master's Signature and Master's Stamp:

Original: Ship's file
Copies: agents and others eventually as required

| COMPANY FORM | Revision 0 | 01-10-2004 | Page 1 of 1 |

24. Lien

The Carrier shall have a lien on the cargo for freight and dead-freight only.

The value of the cargo on which the Carrier exercises a lien shall not exceed the amount of the unpaid freight and/or dead-freight.

The value of the cargo shall be based on the Merchant's purchase invoice of the cargo.

25. Time for shipment

Should the vessel not be ready to load (whether in berth or not) on or before the final days of laycan, Merchants have the option of cancelling this contract. In case vessel is delayed and unable to be ready to load until the agreed cancelling date the Carrier will inform the Merchant accordingly and the Merchant to declare latest within 1 working day after receipt of Carrier's notice whether to cancel the contract or whether they extend the cancelling date to the date as requested by the Carrier. In case of no reply within the above mentioned time limit, it is agreed that the cancelling date has been extended, but only if the new cancelling date will not be later than 4 days after the initially agreed cancelling date.

26. Stowage

The cargo is to be loaded under deck, cool and away from heat and in unobstructed main compartments only.

27. Rotation

The vessel is to sail directly from the cocoa load port to the cocoa discharge port.

28. Origin/Destination Clause

The Carrier warrants that the vessel is in all respects eligible for trading to the ports, places or countries and that at all necessary times the vessel and/or the Carrier shall have all valid certificates, records or other documents required for such trade.

29. Suitability

The Carrier warrants that the vessel is fully and in every way fitted and suitable for the carriage of cocoa beans in bags. All compartments are to be clean, dry, free from insects and other vermin, loose rust and scale, smell and in a fit and proper state. The cargo is to be loaded under deck, cool and away from heat and in unobstructed main compartments only. If the vessel fails inspection the Carrier is to expedite cleaning in order to have the vessel clean and loadready at the earliest moment. The Carrier shall use all possible means to make the vessel clean, including, but not limited to, the hiring of shore labour and/or equipment at their expense. The Carrier shall be liable for all costs and expenses of fumigation of the vessel.



30. ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Booking Note, the Carrier shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Carrier shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Merchant. Except as otherwise provided in this Booking Note, loss, damage, expense or delay caused by failure on the part of the Carrier or "the Company" to comply with the ISM Code shall be for the Carrier's account.

31. Hatch clause

The vessel's hatches have to be watertight with rubbers and seals in place and the vessel to be in every respect in seaworthy condition and suitable to load the cargo contracted. The Carrier is to ensure that all prudent measures are taken to maintain the watertight integrity of the hatches, including, if necessary, caulking and taping hatches.

32. Ventilation

The Master is to operate the vessel's ventilation to minimise condensation.

33. Packing

The Carrier is responsible for all leak, slack, torn, wet, stained -even if dry- and discoloured - even if dry- bags.
The Carrier is to refuse to load for shipment any bag in the following condition(s):

-leak
-slack
-torn
-wet
-stained, even if dry
-discoloured, even if dry
-bags with residues of pesticides

Any bag in the above condition(s) is to be replaced with a bag in sound condition by the supplier

34. Tally

The Carrier is responsible for the outturn tally. The Carrier is responsible for the outturn of exactly the number of bags reflected in the Bills of Lading.

35. Loading and Discharge

The cargo is to be loaded and discharged in Bill of Lading lots.

### 36. Discharge/Delivery

The Carrier is to discharge/deliver the cargo against presentation of at least 1/3 original Bill of Lading only.

In case the receiver and/or their agents are not able to present the original Bill(s) of Lading before commencement of discharge/delivery, then only Continaf B.V. could authorise the Carrier to discharge/deliver the cargo without production of the original Bill(s) of Lading.

### 37. Notice clause

The Carrier/Master to give Merchants 10/7/5/3/2/1 days notice of vessel's estimated time of arrival at loading and discharge port(s). On sailing the Carrier/Master is to advise the Merchants of the quantity loaded, the sailing time and the estimated time of arrival at the discharge port(s).

### 38. Seaworthy trim

The Carrier warrants the vessel is able to safely sail between the loading/discharging berth(s)/anchorage(s)/port(s).

### 39. Taxes and/or dues

Any taxes and/or dues on vessel and/or flag and/or crew to be for the Carrier's account. Any taxes and/or dues on cargo and/or freight to be for the Merchant's account.

### 40. Loading Operations, Weather and Temperature reports

The Master is to complete the Loading Operations, Weather and Temperature reports. These 3 reports, duly signed and stamped by the Master, are to be presented to the Merchant.

### 41. Confidentiality

The terms of this contract are to remain strictly private and confidential and are not under any circumstances to be divulged by either party hereto to any third party(ies) whatsoever.

However, in the event of a demand for information or documents being made by any Government Department, Authority of other Statutory Agency, either party is allowed to comply with such demand.



Additional clauses to "Conlinebooking 2000" Liner Booking Note - cocoa beans, bags, sole cargo

page 4 of 5
15-02-08

## 42. ISPS/MTSA CLAUSE FOR VOYAGE CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

(ii) Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

(d) Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party

Additional clauses to "Conlinebooking 2000" Liner Booking Note - cocoa beans, bags, bulk cargo

# EXHIBIT 2

**[SERIF]**
**From:** <postfixture@ralloshipping.com>
**To:** "M&M Marine Istanbul" <mmmarine@mmmarine.net>
**Cc:** <dry@ralloshipping.com>
**Subject:** M/V LIBERTAS
**Received:** 04-04-2008 11:51:41

FM R A L L O S H I P P I N G - I T A L Y
Shipbrokers - Shipmanagers
Phone : +39-0923-714499 / 953308 - Fax : +39-0923-714028
Email : postfixture@ralloshipping.com - Tlx 910176 RALMAR I
**************************************************
**************************************************

TO: M M MARINE / ISTANBUL

ATT: CAPT. MEHMET

**RE: M/V LIBERTAS**
--------------------------

FOLL TELCON OF THIS MORNING, PLS NOTE:

- VSL ARRIVED TUNIS ANCHORAGE AREA ( DUE TO BAD WEATHER) 28/03 09:53 HRS
- VSL SAILED FM TUNIS ANCHORAGE AREA   29/03 A.M.
- ARRIVED LA VALLETTA OUTER ROADS   01/04 08:00 HRS LT. ( FOR BUNKER SUPPLY AND CHANGE
  THE MASTER)

OWNERS INFORM US THAT THIS AFTERNOON THE VSL'S FLAG STATE INSPECTOR IS SCHEDULED TO
GO ON BOARD THE VSL TO MAKE THE INSPECTION.

REVERTING

BRGDS

Pietro Alagna
RALLOSHIPPING - ITALY
Postfixture desk
PHN : +39-0923-714499 / 953308
FAX : +39-0923-714028
Yahoo ID : pietro_ralloshipping
Company with quality system ISO 9001:2000 certified by R.I.NA.

# EXHIBIT 3

**[SERIF]**
**From:** "dry/ralloshipping.com" <dry@ralloshipping.com>
**To:** "M&M Marine Istanbul" <mmmarine@mmmarine.net>
**Subject:** LIBERTAS
**Received:** 22-04-2008 16:37:44

FM  R A L L O S H I P P I N G  -  I T A L Y
Shipbrokers - Shipmanagers
Phone : +39-0923-714499 / 953308 - Fax : +39-0923-714028
Email : dry@ralloshipping.com - Tlx 910176 RALMAR I
****************************************************
****************************************************

MEHMET / FRANCESCO

Re: "LIBERTAS" - At Malta 8.4.2008

PLS FIND HEREBELOW MESSAGE RECEIVED FM OWNERS :

QUOTE                                                              :

**w i t h o u t   p r e j u d i c e**

We refer to our recent discussions in this matter and wish to inform you that we met the
Owners/Managers of the above vessel this morning. We have also been able to obtain some
documents that are relevant and shed some light on this unfortunate incident. Upon
consideration of the papers and in the light of our meeting with the owners, we are able
to provide the following preliminary comments.

1. Chronology of Events

·The Vessel was instructed to proceed to San Pedro/Ivory Coast in order to load cocoa
beans in bags. At arrival in San Pedro road, on 23/02/2008, at 08:00 hours, the ship was
at anchorage for 12 days due to cargo not being immediately available for loading. Whilst
waiting to berth, the master and crew, checked and carried out minor maintenance works to
the ship's hatch covers, hydraulic pipes for hatch covers, tested bilge and ballast
suction system. Loading was made with ship's cargo gears without any delay or remarks.

·Bureau Veritas that  was asked from Rina  to inspect so as to carry out an Occasional
Survey on the vessel prior to departing from San Pedro, and the vessel's Class was
confirmed with the following endorsement for the single voyage from San Pedro to repair
shipyard, Tuzla (Turkey) with intermediate Port Marmara sea. Limit date:  20/03/2008;

·On 05/03/2008, at 10:00 hours, Vessel commenced loading, according to the Statement of
Facts;

·On 8/03/2008, 22:50 hours, completed loading of 3,879.677 MT cocoa in bags for Turkey,
and Vessel sailed on 08/03/2008 at 24:00 hours, according to the Statements of Facts;

·On 20/03/2008, the ballast water in tanks were taken out completely and the vessel took
in fresh sea water. This operation was made in compliance with the requirements of the
Turkish authorities;

·On 22/03/2008, after passing Gibraltar Strait,  ship started to encounter strong westerly
wind with wind force 6-7-8- BS. In next days, and as recorded in the Master's  Handover
Report dated 05/04/2008 "the winds increased sea becoming higher vessel being stressed by
heavy pitching and rolling. For ship's safety and stability on decided to make full the
ballast tanks DBT 3 port and std. ......................... Even in this way ship continue to be stressed
by heavy W sea and NNW swell";

                                                              :

·According to discussions held between the vessel/crew and the vessel's managers, there
was a situation a great panic/confusion on board due to the heavy weather encountered by
the vessel and the health conditions of the Master, who during all the period of bad
weather was said to have been greatly stressed. We were advised that the Master and some
of the officers/crew on board did not get any sleep for 3 to 4 days.

·On 25/03/2008 afternoon the vessel's Main Engine was reported to have stopped a few
times, with the vessel remaining adrift to repair broken cooling pipes fuel injection
valve and at 23:00 hrs same day this was resolved with satisfactory results;

·On 28/03/2008 at about 04,00 Vessel arrived at Malta anchorage in order to disembark the seriously ill Master;

·On 4 April 2008, the Panama Maritime Authority carried out an Annual Inspection at the port of Valletta (Malta), in accordance with its regulations

·According to the  Medical Report (Valletta, 5/04/2008 Patient: Andryeyev Pavlo), compiled by Dr. M.Rizzo Maudi: "During the voyage at Mediterranean sea 26, 27 and 28 March 2008, the ship meet very heavy weather. Main engine of ship was out of order. The ship was pitching and rolling heavily, list reach up to 40 dg, and captain Andryeyev Pavlo all this time present on bridge, no rest. Due of high stress, on 28/03/2008 start to feel  bad with nausea, left arm and left leg feeling weak, felt that heart is squeezed. Since then he had to rest at bed". Other observations doctor: "This gentleman is unfit to continued with his  duties". The Master was said to have suffered from stroke.

·On 7/04/2008 Change of Crew. According to "Interim Survey Endorsement Sheet" (RINA), Place of Survey Off-Malta: Class confirmed

·On 8/04/2008 whilst leaving Malta, the main engine was reported to have failed. The cause of this is currently being investigated.
Call again Rina survey and him need the check of all equipment on engine from authorized company
The owner call Wartisila of Genoa ( Italy) authorized company for check main engine and equipment but the tecnical can interview on board only in date 18/04/08, we waiting the report of this company and only after RINA can give permition and class for departure; Without class certificate we cannot departure from Malta, in case we see that spent more time we organize in another way

BEST REGARDS
A. DE SENA

UNQUOTE

BEST REGARDS
Francesco Rallo (as broker only)
Ralloshipping - Italy
Dry Cargo Chartering Desk
Phn : +39-0923-714499 / 953308
Fax : +39-0923-714028
Mob : +39-328-9542658
Yahoo-ld : francesco_ralloshipping
Skype-Id : francesco_ralloshipping
E-mail / Msn-Id : dry@ralloshipping.com
Website : www.ralloshipping.it
Company with quality system Iso 9001:2000 certified by R.I.Na.