UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
DOPMAR S.R.L.,

                                      **08 Civ. 5009 (RPP)**

        Plaintiff,

                                  SUR-REPLY DECLARATION

        -against-

BASIC COMMODITIES B.V. a/k/a
BASIC COMMODITIES - AMSTERDAM,

        Defendant.
---------------------------------X

    I, Garth S. Wolfson, hereby declare as follows:

    1.   I am a partner with the firm of Mahoney & Keane, LLP, counsel of record for plaintiff, DOPMAR S.R.L.  Based upon my personal knowledge and my review of the file maintained by my office, I am familiar with the proceedings in this case.

    2.   Herewith attached are true copies of the following:

| | |
|---|---|
| Exhibit 9: | Bareboat Charter for the subject vessel, then known as the M/V KEVIN, dated November 26, 2006; |
| Exhibit 10: | Protocol of Delivery and Acceptance dated December 18, 2006; |
| Exhibit 11: | Endorsement dated May 18, 2007 confirming the vessel's change of name to the M/V LIBERTAS as of April 23, 2007; |
| Exhibit 12: | Turkish Precautionary Judgment Request and Translation; and |
| Exhibit 13: | Brookes Bell Survey Report, without attachments. |

3.    Plaintiff notes that BASIC has failed to rebut the Declaration of English counsel confirming that plaintiff is seeking contractual indemnification, which is ripe under English law.  Nor is there any dispute that arbitration has been commenced between plaintiff and BASIC in London, accordingly.  As such, plaintiff's secondary argument that the claim would also otherwise be ripe by virtue of the arrest of plaintiff's vessel need not even be reached.

4.    However, to the extent the Court is inclined to visit that alternative argument, BASIC's position is misleading, at best.  At all pertinent times, plaintiff was, in fact, the bareboat charterer of the vessel.  (Exhibit 9; Exhibit 10; Exhibit 11).

5.    "[Unlike other types of charterers,] the [bareboat] charterer takes complete control of the vessel, mans it with his own crew, and hence is treated by law as owner *pro hac vice*." Nichimen Co. v. M.V. Farland, 462 F.3d 319, 331 n.10 (2d Cir. 1972); see also, Stolthaven Houston, Inc. v. Rachel B, No. 08 Civ. 4327 (RPP), 2008 U.S. Dist. LEXIS 55723 (S.D.N.Y. Jul. 18, 2008) ("[A] true bareboat charter shifts responsibility for any costs incurred from the owner of the ship to the charterer."); Caterpillar, Inc. v. M/V Karonga, No. 06 Civ. 8236 (NRB), 2008 U.S. Dist. LEXIS 33428, *7 n.16 (S.D.N.Y. Apr. 23, 2008) ("It is

well-settled in maritime law that the registered owner of a vessel
under bareboat charter is not a 'carrier' subject to liability for
cargo loss or damage."); Travelers Indem. Co. v. SS Polarland,
418 F. Supp. 985, 990 (S.D.N.Y. 1976) (Weinfeld, J.).

6.    The hyperbole of BASIC's counsel notwithstanding,
nowhere does the Complaint, in fact, state that plaintiff was
the registered owner of the vessel.  And referring to the arrest
of "its vessel" can hardly be said to be less than accurate.
There is no question that, by virtue of the bareboat charter,
the law does treat plaintiff as the owner for all purposes
relevant to this case.  The registered owner suffered no loss as
a result of the vessel's arrest; only plaintiff did.  It is also
telling that BASIC fails to mention that the Turkish Court
proceedings have been lodged only against plaintiff; they
expressly name DOPMAR, the owner pro hac vice, and do not refer
to the registered owner at all.  (Exhibit 13).

7.    BASIC also asserts arguments that the damages at issue
were caused by vessel problems, rather than by charterers' cargo
stowage and handling operations.  Those arguments will no doubt
be heard and decided in the arbitration.  It would be clearly
inappropriate for the Court to consider such fact-based
arguments on the merits in the context of evaluating a Rule B
attachment.  See, generally, Aqua Stoli Shipping, Ltd. v. Gardner

Smith Pty, Ltd., 460 F.3d 434 (2d Cir. 2006).

    8.   But, again, should the Court nonetheless be interested in visiting that issue, BASIC is wrong on the facts. Plaintiff's surveyors have confirmed that minor seawater ingress may have effected only 66 bags; the damages, secured by virtue of the $4,000,000 Turkish Precautionary Judgment and the vessel's arrest, were overwhelmingly attributed to the stowage and dunnaging, especially given the self-heating characteristics of the cargo, for which BASIC was plainly responsible under the charter party. (Exhibit 12).

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 2, 2008
New York, New York

                      Respectfully submitted,

                      MAHONEY & KEANE, LLP
                      Attorneys for Plaintiff

        By:
                      Garth S. Wolfson (GW 7700)
                      11 Hanover Square, Tenth Floor
                      New York, New York 10005
                      (212) 385-1422

| | |
|---|---|
| 1. Shipbroker | BIMCO STANDARD BAREBOAT CHARTER CODE NAME: "BARECON 2001" PART I |
| | 2. Place and date<br>Oslo / Naples 28th November 2006 |
| 3. Owners/Place of business (Cl. 1)<br>Atlantic Minibulk AS<br>Grev Wedels plass 9<br>0107 Oslo,<br>Norway | 4. Bareboat Charterers/Place of business (Cl. 1)<br>Dopmar Srl<br>Via VITTORIO VENETO, 410<br>80059 Torre del Greco<br>Naples<br>Italy |
| 5. Vessel's name, call sign and flag (Cl. 1 and 3)<br>"Kevin", Call sign 3EAV, IMO no. 8220759 | |
| 6. Type of Vessel<br>Bulk Carrier | 7. GT/NT<br>4,493/2,809 |
| 8. When/Where built<br>1985 Turkiye Gemi Sanayii A.S. Pendik Tersanesi, Istanbul, Turkey | 9. Total DWT (abt.) in metric tons on summer freeboard<br>7,250 |
| 10. Classification Society (Cl. 3)<br>RINA 100-A-1.1-Nav IL; GC, IAQ-1-16 | 11. Date of last special survey by the Vessel's classification society<br>——— |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)<br>3 holds/3 hatches; LoA 111,30 m; Beam 17,00 m. | |
| 13. Port or Place of delivery (Cl. 3)<br>As per MoA | 14. Time for delivery (Cl. 4)<br>Simultaneously with delivery under the MoA<br>15. Cancelling date (Cl. 5)<br>As per cancelling date of the MoA |
| 16. Port or Place of redelivery (Cl. 15)<br>World Wide within IWL in Charterers' option | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15)<br>6 months |
| 18. Running days' notice if other than stated in Cl. 4<br>N/A | 19. Frequency of dry-docking (Cl. 10(g))<br>As required by class |
| 20. Trading limits (Cl. 6)<br>World wide within Institute Warranty Limits | |
| 21. Charter period (Cl. 2)<br>4 years, each year consting of 365 days (366 days in leap years), counting from the time and date of delivery to Owners under the MoA plus 4x1 CHOP. See Clause 38 | 22. Charter hire (Cl. 11)<br>See Clause 38 |
| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii))<br>any requirements shall be dealt with for the sole account of the Charterers | |
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV<br>Libor 1 month plus 3 per cent per annum | 25. Currency and method of payment (Cl. 11)<br>EURO by SWIFT transfer as per Owners invoice instructions |

WORKING COPY

WORKING COPY

First issued by The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974 as "Barecon 'A'" and "Barecon 'B'". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's idea

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen, Issued November 2001

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"BARECON 2001" STANDARD BAREBOAT CHARTER PART I

| 26. Place of payment, also state beneficiary and bank account (Cl. 11) | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional) |
|---|---|
| | Charterers' obligations always to be fully guaranted by Tradewood Shipping Company SAS See also Clause 57 |

| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument, and name of Mortgagee(s)/Place of business) (Cl. 12) | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies) |
|---|---|
| First Priority Mortgage in favour of Hollandsche Bank-Unie (HBU)-, Clause 12 (b) applies | See Clause 51. Clause 14 does not apply. |

| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g)) | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g)) |
|---|---|
| N/A | Any insurance required for the Vessel's trading. Such insurances shall not exceed the the minimum insured value required by Clause 13 (a) or the first paragraph of Clause 51 without the prior written consent of the insurers of those primary insurances. |

| 32. Latent defects (only to be filled in if period other than stated in Cl. 3) | 33. Brokerage commission and to whom payable (Cl. 27) |
|---|---|
| N/A | |

WORKING COPY

| 34. Grace period (state number of clear banking days) (Cl. 28) | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30) |
|---|---|
| 5 Banking Days | London, English law, Clause 30(a) |

| 36. War cancellation (indicate countries agreed) (Cl. 26(f)) |
|---|
| N/A |

| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional) | 38. Name and place of Builders (only to be filled in if PART III applies) |
|---|---|
| No | |

| 39. Vessel's Yard Building No. (only to be filled in if PART III applies) | 40. Date of Building Contract (only to be filled in if PART III applies) |
|---|---|
| | |

| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1) |
|---|
| a) |
| b) |
| c) |

| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional) | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional) |
|---|---|
| Part IV does not apply | No |

| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies) | 45. Country of the Underlying Registry (only to be filled in if PART V applies) |
|---|---|
| N/A | N/A |

| 46. Number of additional clauses covering special provisions, if agreed |
|---|
| Rider Clauses 32 to 58 |

WORKING COPY

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

18/12 '06 14:09 FAX 31 10 4042333      SIMMONS & SIMMONS

PART II
"BARECON 2001" Standard Bareboat Charter

1.  **Definitions**
In this Charter, the following terms shall have the meanings hereby assigned to them:
"The Owners" shall mean the party identified in Box 3;
"The Charterers" shall mean the party identified in Box 4;
"The Vessel" shall mean the vessel named in Box 5 and with particulars as stated in Boxes 6 to 14.
"Financial Instrument" means the mortgage, deed of covenant or other such financial security instrument as annexed to this Charter and stated in Box 28.
"MoA" shall mean the Memorandum of Agreement of the date hereof between Owners as buyers, and Wellate Group Corp. as sellers in respect of the Vessel.

2.  **Charter Period**
In consideration of the hire detailed in Box 22, the Owners have agreed to let and the Charterers have agreed to hire the Vessel for the period stated in Box 21 ("The Charter Period").

3.  **Delivery** See also Clauses 32, 35 and 36
(not applicable when Part III applies, as indicated in Box 37)
(a) The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy and in every respect ready in hull, machinery and equipment for service under this Charter.
The Vessel shall be delivered by the Owners and taken over by the Charterers at the port or place indicated in Box 13 in such ready safe berth as the Charterers may direct.
(b) The Vessel shall be properly documented on delivery in accordance with the laws of the flag State indicated in Box 5 and the requirements of the classification society stated in Box 10. The Vessel upon delivery shall have her survey cycles up-to-date and trading and class certificates valid for at least the number of months agreed in Box 12.
(c) The delivery of the Vessel by the Owners and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause 3, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be liable for the cost of but not the time for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under this Charter, provided such defects have manifested themselves within twelve (12) months after delivery unless otherwise provided in Box 32.

4.  **Time for Delivery** See Clause 32
(not applicable when Part III applies, as indicated in Box 37)
The Vessel shall not be delivered before the date indicated in Box 14 without the Charterers' consent and the Owners shall exercise due diligence to deliver the Vessel not later than the date indicated in Box 15.
Unless otherwise agreed in Box 15, the Owners shall give the Charterers not less than thirty (30) running days' preliminary and not less than fourteen (14) running days' definite notice of the date on which the Vessel is expected to be ready for delivery.
The Owners shall keep the Charterers closely advised of possible changes in the Vessel's position.

5.  **Cancelling** See Clause 32
(not applicable when Part III applies, as indicated in Box 37)
(a) Should the Vessel not be delivered latest by the cancelling date indicated in Box 14, the Charterers shall have the option of cancelling this Charter by giving the Owners notice of cancellation within thirty-six (36) running hours after the cancelling date stated in Box 15, failing which this Charter shall remain in full force and effect.
(b) If it appears that the Vessel will be delayed beyond the cancelling date, the Owners may, as soon as they

are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty-eight (168) running hours of the receipt by the Charterers of such notice or within thirty-six (36) running hours after the cancelling date, whichever the earlier. If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be substituted for the cancelling date indicated in Box 14 for the purpose of this Clause 5.
(c) Cancellation under this Clause 5 shall be without prejudice to any claim the Charterers may otherwise have on the Owners under this Charter.

6.  **Trading Restrictions**
The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise within the trading limits indicated in Box 20.
The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the contracts of insurance (including any warranties expressed or implied therein) without first obtaining the consent of the insurers to such employment and complying with such requirements as to extra premium or otherwise as the insurers may prescribe.
The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the law of any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation.
Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to a loading thereof.

7.  **Surveys on Delivery and Redelivery** See Clause 36
(not applicable when Part III applies, as indicated in Box 37)
The Owners and Charterers shall each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder. The Owners and Charterers shall
each bear 50 % of all expenses of the On-hire Survey including loss of time, if any, and the Charterers shall bear all expenses of the Off-hire Survey including loss of time, if any, which shall be for Charterer's account at the daily equivalent to the rate of hire or pro rata thereof.

8.  **Inspection**
The Owners shall have the right at any time after giving reasonable notice to the Charterers and as far as possible without interfering with the operation of the Vessel to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf:-
(a)  to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. The costs and fees for such inspection or survey shall be paid by the Owners unless the Vessel is found to require repairs or maintenance in order to achieve the condition so provided;
(b)  in dry-dock if the Charterers have not dry-docked her in accordance with Clause 10(g). The costs and fees for such inspection or survey shall be paid by the Charterers; and

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Draft 271106

Rider Clauses 32 to 58
to
Bareboat Charter Party
Dated 28 November 2006
(the "Charter")
between
Dopmar Srl
and
Atlantic Minibulk AS
In respect of
MV "Kevin "

## 32. Delivery

The Owners (as buyers) have entered into an agreement for the purchase of the Vessel from Clavius Shipping Inc. (the "Sellers") in accordance with the Memorandum of Agreement of even date herewith (the "MOA"). The Owners' obligation to charter the Vessel to the Charterers hereunder is conditional upon contractual delivery of the Vessel to the Owners under the MOA.

If for any reason whatsoever prior to delivery of the Vessel under the MOA, the MOA is cancelled or the Vessel becomes a Total Loss, or if for any reason whatsoever the Vessel is not delivered under the MOA, this Charter shall be automatically cancelled and considered null and void whereupon neither the Owners nor the Charterers shall have any obligations or claim against the other under this Charter.

It is agreed that delivery under the MoA and the Charter shall take place simultaneously, and, subject to the Vessel being delivered to, and taken over by the Owners (as buyers) pursuant to the MOA, the Charterers shall forthwith be deemed to have taken delivery of the Vessel under this Charter. As the Sellers and the Charterers have close contacts with each other, no notice of estimated delivery time or place is required from the Buyers under this Charter. The date (and time) of delivery for the purpose of this Charter shall be the date (the "Delivery Date") (and time) when the Vessel is in fact delivered by the Sellers to the Owners (as buyers) pursuant to the MoA, whether that be before or after the scheduled date therefore under the MoA, and the Owners shall be under no responsibility for any delay whatsoever in delivery of the Vessel to the Charterers under this Charter.

Owners' obligation to Charter the Vessel to the Charterers is further conditional upon the first month's charter hire being paid in accordance with Clause 33, last paragraph at the time of delivery and on the further conditions

Draft 271106

set out in Clause 35. If for any reason whatsoever, the Vessel is not delivered under the MOA, this Charter Party shall be automatically cancelled and considered null and void whereupon neither the Owners nor the Charterers shall have any obligations or claim against the other under this Charter.

### 33. Seller's Credit

Sellers have extended Owners a Seller's Credit of EUR                          (the "Seller's Credit). The terms of the Sellers's Credit are set out in the Seller's Credit Agreement between Sellers and Owners of even date herewith .

The Sellers' Credit shall serve as security for the performance of Charterers' obligations under this Charter and the Related Charters. In case of cancellation of the Charter or any of the Related Charters due to breach of the Charter or, as the case may be, any of the Related Charters by the Charterers, the Seller's Credit shall be regarded as reimbursed (it being understood that this forfeiture is by way of minimum damages and not by way of penalty).

### 34. Related Agreements: delete

### 35. Conditions for delivery

The obligation of the Owners to charter the Vessel to the Charterers under this Charter is subject to and conditional upon, prior to delivery of the Vessel under this Charter, the Charterers obtaining and presenting to the Owners the following documents:

(a) the payment of Seller's Credit;

(b) copies of the SMC and ISPS certificates in respect of the Vessel;

All documents to be in English, or if in another language, to be accompanied by certified translations into English.

### 36. Vessel's condition on delivery

The Vessel shall be delivered under this Charter Party in the same condition and with the same equipment inventory and spare parts as it is delivered under the MOA.

As prospective buyers of the Vessel pursuant to the MoA, Owners will survey the Vessel prior to taking delivery of the Vessel under the MoA. Owners and Charterers agree that such survey to be carried out by the Owners as buyers shall constitute the on-hire survey in respect of the Vessel. The Owners shall has provide the Charterers with a copy of the inspection report dated and Charterers shall co-sign same.

Draft 271106

The Charterers know the Vessel's condition at the time of delivery, and expressly agree that the Vessel's condition is acceptable in every respect and in accordance with the provisions of this Charter and notwithstanding any provision of this Charter, the Charterers shall have no claim whatsoever against the Owners under this Charter or otherwise as a result of the Vessel's condition.

The Vessel shall be taken over strictly "as is/where is", and notwithstanding any provisions of this Charter, the Charterers shall have no claim whatsoever against the Owners under this Charter or otherwise as a result of the Vessel's condition. The Charterers acknowledge and agree that the Owners make no condition, term, representation or warranty, express or implied (and whether statutory or otherwise) as to, seaworthiness, merchantability, condition, design, operation, performance, capacity or fitness for use of the Vessel or as to the eligibility of the Vessel for any particular trade or operation or any other condition, term, representation or warranty whatsoever, express or implied, with respect to the Vessel. Delivery of the Vessel to the Charterers shall be conclusive proof that, for the purpose of the obligations and liabilities of the Owners hereunder or in connection herewith, the Vessel is at the time seaworthy, in accordance with the provisions of this Charter and as described in the On-Hire Survey Report, in good working order and repair and without defect or inherent vice whether or not discoverable by the Charterers.

If any latent defect should occur, same to be repaired by the Charterers at their cost and time. The Charterers agree that the Owners shall be under no liability to supply any replacement vessel or any piece or part thereof during any period for which the vessel is unsuitable and shall not be liable to the Charterers or any other person as a result of the Vessel being unusable.

### 37. Charter Period

1. The Owners shall let to the Charterers and the Charterers shall take the Vessel on charter for a period of 2 years commencing on the Delivery Date (the "**Main Period**").

2. The Charterers further have three optional periods each of 12 months (the "**Optional Periods**"). The Charterers shall exercise their option to the Optional Periods by giving the Owners an irrevocable notice, not less than three (3) months prior to the expiry of the Main Period or the relevant Optional Period.

(The Main Period and the Optional Periods shall in this Charter together be referred to as the "**Charter Period**".)

The redelivery date (the "**Redelivery Date**") shall be the last day of the Main Period or the last day of the last declared Optional Period, as the case may be.

Draft 271106

### 38.  Charter Hire

The Charterers shall pay charter hire ("**Charter Hire**") to the Owners monthly in advance to such bank account as the Owners shall instruct at the following rates:

### 39. Payment of Hire

The obligation to pay hire under this Charter Party is construed to be on "hell and high water" terms. Thus save as provided in Clause 28 (b and Clause 41 below, the Charterers' obligation to pay hire and perform any obligations under this Charter Party shall be absolute and unconditional and shall not be affected by and shall be irrespective of any contingency whatsoever including:

(a) any right of set-off, counter-claim, withholding or deduction;

(b) any unavailability of the Vessel for any reason including but not limited to requisition, or any restriction against or interference with the use of the Vessel or any defect in the seaworthiness or satisfactory quality, fitness for any purpose, condition, design or operation of any kind of the Vessel or the eligibility of the Vessel for any particular use or trade or the absence of any permit or other documentation required under the applicable law of any relevant jurisdiction for the chartering, use, operation or location of the Vessel or any damage to the Vessel or any part thereof; and

(c) any other cause which would have the effect of terminating or in any way affecting any obligation of the Charterers hereunder.

The first Charter Hire payable by Charterers on the delivery of the Vessel by Owners to Charterers hereunder, shall be calculated in accordance with Clause 11 b), line 297 and payment shall be made to Sellers under the MoA as payment on behalf of Owners of corresponding part of the Purchase Price under the MoA.

### 40. Off-hire, set off and payments

(a) Notwithstanding any provision to the contrary in this Charter, the Vessel shall not at any time be placed off hire except off-hire in relation to a sale covered by Clause 49 (if any), and hire shall continue to be paid by the Charterers in full for the whole and uninterrupted period from delivery until redelivery of the Vessel, or the Charterers' obligation to pay hire ceases in accordance with Clause 28 (b) or 39, without any kind of set-off, deduction or counterclaim.

Draft 271106

(b) If the Charterers is required by any authority in any country to make any withholding or deduction from any such payment, or the Owners is required to pay any taxes or dues in any jurisdiction other than Norway, the Charterers shall make such withholding or deduction or pay such tax or due so that the Owner at all times receive and retain until taxed in Norway a net sum equal to the amount which it would have received had no such deduction or withholding been made or such due or tax be required to be made.

(c) If, under any applicable law, any payment to be made by the Charterers hereunder is made or is recovered in a currency other than the currency in which it is payable pursuant to this Charter then, to the extent that the payment (when converted into the currency of obligation at the rate of exchange on the date of payment) falls short of the amount unpaid under this Charter, the Charterers shall as a separate and independent obligation, fully indemnify the Owners against the amount of such shortfall.

## 41. Total Loss

(a) In the event that the Vessel becomes a Total Loss, the Charterers shall be under no obligation to pay hire after the date of such Total Loss provided that:

    (i) the Vessel is insured in accordance with the terms of this Charter; and

    (ii) payment of insurance proceeds in respect of the Total Loss is made in a sum no less than required in Clause 51 and received in full by the Owners within ninety (90) days of the date of the occurrence of that Total Loss.

(b) In this Charter "Total Loss" shall mean:

    (i) an actual, constructive, compromised or agreed total loss of the Vessel; or

    (ii) a capture, seizure, arrest or confiscation of the Vessel by any government or by persons acting or purporting to act on behalf of a government unless the Vessel shall be released from such capture, seizure, arrest or detention within 12 months after the occurrence thereof, or as such earlier time as the Vessel is deemed to be a Total Loss under the Vessel's relevant insurances.

(c) In this Charter, a Total Loss shall be deemed to have occurred on:

    (i) in the case of an actual loss of the Vessel, the date on which it occurred or, if that is unknown, the date when the Vessel was last heard of; or

    (ii) in the case of constructive or compromised total loss of the Vessel, the date of a compromise, arrangement or agreement is made with the

Draft 271106

Vessel's insurers in which the insurers agree to treat the Vessel as a total loss.

## 42. Attendance at dry-docking

The Charterers shall give Owners reasonable notice in advance of any dry-docking of the Vessel, and Owners shall be entitled to have a representative and a surveyor attending any such dry-docking at Owners' expense and without interference of the Charterers' operation and/or the Vessel's readiness for navigation.

## 43. Management

The technical management of the Vessel shall be with the Charterers or such other manager as the Owners may approve during the currency of this Charter. Such approval not to be unreasonably withheld.

## 44. Assignments

a) As security for its obligations under the Charter, the Charterers shall assign to the Owners all its rights, benefits and interests in any and all sub-charters and contracts in respect of the Vessel, any earnings in respect of the Vessel, and all insurances.

b) The Owners shall have the right to assign to any and all mortgagees of the Vessel, including the Mortgagee, any and all of the rights, benefits and interest of the Owners in and to this Charter, including but not limited to assignments of earnings and assignment of this Charter, and of the Vessel's insurances, and of the Guarantee (as hereinafter defined). Further, the Owners shall have the right to on-assign to the Mortgagee any and all assignment by the Charterers.

## 45. Boycott

The Charterers shall use their reasonable endeavours to trade the Vessel in such way that she at the time of redelivery not will be exposed to any boycott by major shipping and trading port and/or country.

## 46. Default

i) Subject to ii) below, if the Charter is terminated by the Owners following the occurrence of a Termination Event or for other good reason, the Seller's Credit and any interest earned but unpaid shall be forfeited.

ii) Before the Sellers's Credit becomes forfeit the Owners must give the Charterers notice of default and a 5 (five) day grace period to rectify it.

iii) It is agreed that forfeiture by Sellers of the Seller's Credit is an agreed minimum compensation for losses that Owners may suffer and not a

Draft 271106

penalty. The forfeiture of the Seller's Credit shall, however, not prevent Owners from claiming damages if actual losses and expenses following termination of the Charter exceed the amount of forfeited Sellers' Credit

## 47. Spares/bunkers/stores

The Charterers shall not pay for bunkers, lubricating oil, water and unbroached provisions, paints, oil, ropes and other consumable stores in the Vessel on delivery which are the property of the Sellers.

The Owners shall pay for remaining bunkers and lubricating oils being the property of the Charterers at the time of redelivery unless Charterers have declared their Purchase Option in accordance with Clause 50, in which case the remaining bunkers and lubricating oils at the time of such declaration shall remain the property of the Charterers and no payment from Charterers is applicable.

Owners shall on redelivery take over, but not pay for water and unbroached provisions, paints, oil, ropes or other consumable stores in the Vessel.

## 48. Flag and Name

With the exception of costs incurred as a result of a transfer of the ownership in accordance with Clause 49 below during the Charter Period and the costs of initial registration of the Vessel in the name of the Owners in the Panamanian Ship Register, which shall be paid by Owners, all costs, taxes and expenses incurred in connection with compliance with requirements from the Panamanian authorities regarding the Vessel's technical condition and equipment and including any and all annual taxes and fees, shall be borne by the Charterers.

## 49. Transfer of the Vessel: delete

## 50. Charterers' Purchase Option

The Charterers shall have the option (the "Purchase Option") to purchase the Vessel and the Related Vessels as from the 3rd Anniversary of the Delivery Date and thereafter on each subsequent anniversary of the Delivery Date at the following net prices:

| Purchase Date is the date falling on the: | Purchase Price: |
|---|---|
| 31/12/2009 the Delivery Date | |
| 2nd Anniversary of the Delivery Date | |

Draft 271106

If the Charterers wish to exercise the Purchase Option they shall notify the Owners thereof in writing three (3) months prior to the relevant anniversary date of the Delivery Date. Once given, such notice shall not be withdrawn. At the resultant sale, the outstanding Sellers's Credit will be deducted from the purchase option price on delivery of the Vessel.

Upon declaring the purchase option, the Charterers to pay a 10% deposit as security for fulfilment of their obligations under the MoA for the resultant sale.

If the Owners has entered into any interest swap agreements, all costs related to terminate such swap agreement due to Charterers' exercising their purchase option shall be for Charterers' account, and any such cost shall be payable by the Charterer on the delivery of the Vessel to the Charterers.

If a Purchase Option is exercised, then at the resultant sale, the Vessel shall be delivered to and taken over by the Charterers strictly "as is where lies" and otherwise based on amended NSF93. The delivery of the Vessel to the Charterers shall be on or about the relevant anniversary of the Delivery Date.

If Charterers exercise their option to purchase the Vessel, Charterers shall have the obligation to purchase also the Related Vessels by simultaneously exercising the purchase options set out in the respective Related Charter for delivery of the Related Vessels to the Charterers as Buyers concurrently with the delivery of the Vessel to the Charterers as Buyers hereunder. Owners' obligation to sell the Vessel to the Charterers pursuant to this clause is subject to the Charterers exercising its purchase options for the Related Vessels.

## 51. Insurances

The Charterers shall at all times keep the Vessel fully insured against such risks, in such amounts, on such terms and with such underwriters as the Owners reasonably may require, including but not limited to Hull & Machinery (at least 80% of the market value), Increased Value, P & I and War Risk. The insured value (except for P & I) shall at least be the higher of (i) the market value of the Vessel and (ii) 120% of EUR 2,825,000 for the first year, to be reduced by EUR 100,000 each year of the Charter Period. If the Charterers and the Owners disagree on the market value, same shall be assessed as the average of two valuations carried out by independent shipbrokers appointed by the Owners and the Charterers, the costs of such valuations to be borne equally by the Charterers and the Owners.

The Charterers hereby undertake and agree to indemnify, protect, defend, assume liability for, save and keep harmless the Owners from and against any and all liabilities whatsoever kind and nature, imposed on, incurred or suffered by, or asserted against the Owners in any way relating to or arising of the insurances of the Vessel or to incidents covered by such insurances.

The Charterers will punctually pay all insurance premiums and calls on the Vessel, timely renew the insurances and procure that annual certificates are delivered to the Owners not later than 10 business days prior to the required renewal of the above-mentioned insurances, evidencing that the Vessel is insured and that the Mortgagee is noted as the mortgagee in the Vessel's insurance policies and certificates of entry with first priority. The policies in respect of the Hull and Machinery, increased value and War insurances shall be endorsed to the effect that payment for a claim for a Total Loss or an accident in which cost of repairs exceed EUR 100,000 shall be made to the Owners, or to the Mortgagee as the case may be.

## 52. Redelivery

The Off-Hire Survey referred to in Clause 7 hereof, shall take place at the port of redelivery at or about the time of redelivery.

(a) Without prejudice to the provisions of Clause 15 hereof, the Vessel shall on redelivery to the Owners hereunder;

    (i) maintain the class RINA 100-A-1.1-Nav IL; GC, IAQ-1-16 (or any equivalent class which the Vessel may attain pursuant to this Charter), free of conditions and/or recommendations of class, relevant port state authorities and qualifications of any kind, and with valid, unextended certificates for not less than six (6) months; and

    (ii) be redelivered to the Owners together with all such spare parts and other equipment as are listed in the On-Hire Survey report. Additional spares and equipment on board, purchased for the purpose of facilitating normal and prudent operation of the Vessel, shall be deemed to be a part of the Vessel on redelivery and shall be taken over by the Owners free of charge;

    (iii) have had her underwater parts treated with anti-fouling applied in accordance with the manufacturers recommendations, to last for the ensuing period up to the next scheduled dry docking of the Vessel.

(b) The Owners shall, during a period of thirty (30) days prior to the Redelivery Date, be entitled, at their own risk and expense, to place representatives on board the Vessel for familiarisation purposes, subject to signing of Charterers' standard indemnity letter as annexed hereto.

Without prejudice to the generality of the provisions of Clause 8, any inspection of the Vessel carried out pursuant thereto, may include an underwater inspection of the Vessel provided that the same shall be carried out during such time as she is in port (such inspection not to interfere with or interrupt the trading of the Vessel). Such under-water inspection shall be carried out by a class-approved diver in liaison with a class surveyor at the Owners' time and expense.

Draft 271106

## 53. Representations and Warranties

The Charterers hereby represent and confirm that:

(a) they have due corporate power and authority to enter into and perform their obligations under this Charter;

(b) all consents, approvals or public authorisations which may be required in connection with the entering into and performance of their obligations under this Charter have been obtained;

(c) the shares and ownership in the Charterers are owned by DOPMAR srl

(d) no event that could lead to a default under this Charter has occurred;

(e) they are not aware of any fact or circumstances in existence which could adversely affect its liability to perform its obligations under the Charter;

(f) the entry into and performance of this Charter does not and will not during the Charter Period violate in any material respect any agreement, contract or other undertakings to which they are a party of which is binding on them or any of their assets; and

(g) under the laws of Italy in force at the date hereof, they will not be required to make any deduction or withholding from any payment they may make to the Owners hereunder.

## 54. Undertakings

The Charterers undertake and agree with the Owners that throughout the Charter Period they will:

a) provide the Owners with:

(i) within 150 (one hundred and fifty) days after the close of each financial year, 1(one) copy confirmed by their auditor (who shall be an authorised public accountant) of the audited balance sheets of the Charterers and the Guarantor as of the close of each financial year and audited statement(s) of profit and loss and annual reports; and

(ii) as soon as possible and in no event later than 90 days after the end of each financial half-year of each of the Charterers and the Guarantor their respective reports of the unaudited financial results in a semi-annual basis

Draft 271106

(iii) from time to time such additional financial or other information relating to the Charterers and the Guarantor and their respective business as may be reasonably requested by the Mortgagee.

b) Not without the prior written consent of the Owners, permit any change in its ownership;

c) manage their business, and procure that the Guarantor manage its businesses, in compliance with all relevant applicable laws, regulations and requirements;

d) open and maintain all its bank accounts in respect of the Vessel with the Mortgagee;

e) maintain in its bank account with the Mortgagee a cash deposit of at least EUR

f) not itself, and procure that the Guarantor shall not, without the prior written consent of the Owners, reorganise, merge, de-merge or dispose of any substantial part of its or their business or change their business in any material respect, such consent not to be unreasonably withheld or delayed;

g) as soon as practicable after the same are instituted, provide the Owners with details of any litigation, arbitration or administrative proceedings which, if adversely determined are likely to have a material adverse effect on the operation of the Vessel or this Charter or the Guarantee;

h) promptly notify the Owners in writing of any event of default (or event of which they are aware which, with the giving of notice and/or lapse of time or other applicable condition would constitute a default);

i) not itself, and shall procure that the Guarantor shall not permit of suffer any declared default giving rise to acceleration of any indebtedness in excess of EUR 100,000 to arise or in respect of any of their financial agreements or financial obligations from time to time entered into or assumed by the Charterers or the Guarantor, and will notify the Owner in writing of the occurrence of any declared default under or in respect of such agreements or obligations:

j) notify the Owners of:

(i) any accident to the Vessel involving repairs where the cost is likely to exceed EUR 50,000 (or the equivalent in any other currency);

(ii) any occurrence in consequence whereof the Vessel has become or is likely to become a Total Loss;

(iii) any arrest of the Vessel or the exercise or purported exercise of any lien on the Vessel; and

Draft 271106

k) obtain all necessary ISM Code and ISPS Code documentation in connection with the Vessel and at all time be in full compliance with such Codes.

## 55. Termination Event

Each of the following events shall be a "Termination Event" for the purposes of this Charter;

i.   any sum payable by the Charterers under this Charter or any of the Related Charters or by the Guarantor under the Guarantee shall not be paid on its due date or (in the case only sums expressed to be payable by the Charterers or a Guarantor on demand) within five (5) Banking Days (in Rome, Oslo, London and New York City) following the date of demand therefore; or

ii.  the Charterers or the Guarantor shall at any time fail to observe or perform any other obligation under the Charter or the Guarantee or fail to comply with any of their undertakings in this Charter or the Guarantee, and such failure to observe or perform any such obligation or undertakings is either not remediable or is remediable, but is not remedied within twenty (20) days of receipt by the Charterers of written notice from the Owners requesting remedial action; or

iii. any representation or warranty made (or acknowledged to have been made) by the Charterers as set out in Clause 50 or by any of the Guarantors shall prove to have been untrue, inaccurate or misleading in any material respect when made (and such occurrence continues unremedied for a period of twenty (20) days after receipt by the Charterers of written notice from the Owners requesting remedial action); or

iv.  the Ownership interest in the Charterers is changed in any way without the prior written consent of the Owners; or

v.   the Charterers or the Guarantor shall stop payments generally or shall cease to carry on or suspend all or a substantial part of their business or shall be unable to pay the debts, or shall admit in writing the inability to pay their debts, as they become due or shall otherwise become or be adjudicated insolvent; or

vi.  the Vessel is arrested or detained (other than for reason solely attributable to the Owners), and such arrest or detention is not lifted within fifteen (15)days (or such longer period as the Owners shall agree in the light of all the circumstances); or

vii. if any consent, authorization, licence or approval necessary for this Charter to be or remain the valid and legally binding obligation of the Charterers, or to enable the Charterers to perform their obligations hereunder, shall be materially adversely modified or is not granted or is

Draft 271106

revoked, suspended, withdrawn or terminated or expires and is not renewed (provided that the occurrence of such circumstances shall not give rise to a Termination Event if the same are remedied within twenty (20) days of the date of their occurrence; or

viii.   if the Charterers or any of the Related Sellers is in material breach of any of its or their obligations under the MoA or any of the Related MoAs or any of the Related Charters.

## 56. Owners' Rights On Termination

At any time after a Termination Event shall have occurred and be continuing, the Owners may, by notice to the Charterers, immediately or on such date as the Owners shall specify, terminate the chartering by the Charterers of the Vessel under this Charter, whereupon the Vessel shall no longer be in the possession of the Charterers with the consent of the Owners, and the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 14

## 57. Guarantees and other securities: delete

## 58. Inconsistency

In case of any inconsistency between the standard terms of this Charter and Rider Clauses 32-58, the Rider Clauses shall prevail

IN WITNESS HEREOF the Owners and the Charterers have signed and executed TWO COPIES of this Agreement the day and year first writer.

For the Owners:                                   For the Charterers:

16-DIC-2006 19:40    DA: PENINSULA ENTERPRISE 0339 081 8072121    A: 00019272121    P. 1

18/12 '06 18:44 FAX 31 10 4042355    SIMMONS & SIMMONS

PROTOCOL OF DELIVERY AND ACCEPTANCE

IN RESPECT OF

MV "KEVIN"

KNOW ALL MEN BY THESE PRESENTS THAT:

ATLANTIC JUNIBULK AS of Grev Wedels plass 9, c/o Fearnley Finans ASA, 0151 Oslo, Norway (the "Owners") have delivered in Rotterdam, the Netherlands at 13:45 local time on the 19th day of December 2006 unto DOPMAR SRL of via Vittorio, 40, 80059 Torre del Greco, Naples, Italy (hereinafter called the "Charterers") the vessel MV "KEVIN" with IMO Number 8220759 (the "Vessel") and the Charterers do hereby accept delivery and risks of and to the aforesaid Vessel as at the time and date set forth hereinabove pursuant to the terms and conditions of the Bareboat Charter made between the Owners and the Charterers dated 23rd November 2006 (the "Charter").

OWNERS                         CHARTERERS

Name: _Johann WERNER_          Name: _Antonio and SIRIA / PIERRO CUONO_

Title: _ATTORNEY IN FACT_      Title: _AMMIRAL_

Continuation of Policy
Page 4 of 6

ENDORSEMENT NO:                    1      attaching to and forming part of

POLICY of INSURANCE NO:      01410000001        (Protection & Indemnity)

Vessel:                          KEVIN

Issued by:                       BRITISH MARINE LUXEMBOURG S.A.

It is hereby noted and agreed with effect from the 23rd April 2007 that the above vessel has changed its name to LIBERTAS.
...........................................................................................................................................

All other terms and conditions continue without amendment.

London: 18.05.07

# Brookes Bell

MARINE, SCIENTIFIC & TECHNICAL CONSULTANTS & SURVEYORS
An ISO 9001 Quality Approved Company

Martins Building
Exchange Flags
Liverpool
L2 3PG
Telephone:      0151 236 0083
Facsimile:      0151 236 2945
Email:      liv@brookesbell.com
Website: www.brookesbell.com

MFB Solicitors
45 Moorfields
LONDON
EC2Y 9AE

No.  B072357

1st August 2008

# PRELIMINARY  REPORT

## LIBERTAS – at Ambarli, Turkey May '08.

### Alleged Water Damage to Cargo of West African Cocoa Beans

At the request of MFB solicitors and British Marine Managers Ltd., I travelled to Istanbul and attended onboard LIBERTAS whilst alongside in the port of Ambarli variously between 15th and 24th May.  The purpose of my attendance was to inspect a cargo of bagged cocoa beans from Ivory Coast.

As will be seen from this report, several slight ingresses were noted within the stows which caused damage to a small number of bags, amounting to no more than 100 to 200 in total. However, due to microbiological self-heating within the stows which resulted in slightly elevated temperatures and caking to the contents of the bags, a much larger number of bags were damaged due to wetting caused by ship's sweat and inadequate dunnaging.

At  Liverpool 0151 236 0083  Sidcup 020 8300 0190  Tower Bridge 020 7403 3838

Brookes Bell is the trading name of Brookes Bell LLP, incorporated in England as a limited liability partnership No. OC312225. Registered office: Martins Building, Exchange Flags, Liverpool, L2 3PG

PARTNERS :
Raymond Luukas        John Third        David Anderson        Kai Aamlid        Charles Bliault        Mark Keenor
Brian Boorman         John Gibson       Daniel Sheard         Colin Kershaw     Martin Jonas           Chris Dyson
Richard Gains         Nicholas Crouch   David Burbridge       Tim Moss          Charles Bevis          Paul Cavagan
Brendan Cuffe         Neil Griffiths    Nigel  Thompson       CONSULTANTS:      Malcolm Dann           David Spence

BROOKES BELL                                                    CONTINUATION

- 2 -

B072357                                                          LIBERTAS

# 1. Background.

LIBERTAS arrived at the load port of San Pedro and issued a Notice of Readiness at 0800 hours, 23rd February but didn't berth until 2035 hours, 4th March 2008.  A hold inspection was conducted 2150 to 2300 hours and a hose test prepared for between 1145 and 1420 hours, although the date of these is unclear from the Statement of Facts for San Pedro (see **Appendix No. 1**), as is the time that the hose test was actually performed.  In addition, the empty holds were fumigated prior to the commencement of loading between 2030 and 2410 hours, 4th March.

Between 1000 hours on 5th and 2250 hours 8th March, LIBERTAS loading a total of 58520 bags, amounting to 3879.677 MT, of cocoa in break bulk at San Pedro, Ivory Coast.  She sailed at 2400 hours, 8th March from San Pedro bound for Las Palmas where she arrived, took bunkers and departed on 18th March.  She then proceeded towards Ambarli arriving off Malta on 28th March before continuing onwards again on 30th.  The reason for calling at Malta was reportedly due to the Master having a heart problem.  After recommencing the voyage, LIBERTAS suffered a main engine failure, and had to anchor off Malta again on 31st March.  Ultimately, the majority of the crew were replaced by a substitute crew and LIBERTAS finally completed the voyage to Turkey under tow by the M/Tug OCEAN ERGUN, with the tow line attached at 0730 hours, 30th April and anchored off Bozcaada Island at 2050 hours, 4th May awaiting final towage (see Time Sheet for Towage Operation, **Appendix No. 2**).

She was eventually anchored off Ambarli at 0910 hours, 6th May and an inspection conducted by surveyors representing the Owners and the Receivers and by Quarantine Authorities and the Receivers themselves (see Statement of Facts for Ambarli, **Appendix No. 3**).  Due to infestation, which had been noted at Malta, fumigation with phosphine was ordered prior to permission being granted for berthing.  This was set between 1735 and 2145 hours, 8th May until 1100 hours, 13th May after which the gas was released and the cargo re-inspected by the quarantine authorities at 1620 hours the same day.  The cargo

BROOKES BELL

- 3 -

B072357

LIBERTAS

was found free of live insects and the vessel was brought alongside and made all-fast by 0200 hours, 14th May. Discharge commenced at 0920 hours the same day.

**The Cargo.**

The cocoa was shipped break-bulk in jute bags of 65kg net weight and carried under six Bills of Lading. These Bill of Lading parcels were carried onboard distributed between all three holds. I have summarised the stowage plan (see **Appendix No. 4**) for the cargo below:

| Hold No. | Quantity (MT) |
|:---:|:---:|
| 1 | 865.00 |
| 2 | 1405.00 |
| 3 | 1230.00 |

On the Bills of Lading (see **Appendix No. 5**), the cargo was described as "*Sacs de Cacao en Feves Good Fermented de Cote D'Ivoire*" and "*Recolte* (French for harvest or crop)*: 2007/2008*". For convenience, I have summarised the details from the Bills of Lading in the table below:

| Bill of Lading No. | Shipper | Consignee | Notify Address | Net Weight. (MT) | Gross Weight (MT) | No. Bags. |
|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| 1 | Outspan | To Order | Olam Int. Ltd., 9 Temasek Blvd., 11-02 Suntec Tower 2, Singapore. | 725.725 | 733.555 | 11165 |
| 2 | SAF-Cacao | To Order | To Order | 762.902 | 771.002 | 11550 |
| 3 | SAF-Cacao | To Order | To Order | 758.658 | 766.758 | 11550 |
| 4 | SAF-Cacao | To Order | To Order | 1015.777 | 1026.577 | 15400 |
| 5 | Outspan | To Order | Olam Int. Ltd., 9 Temasek Blvd., 11-02 Suntec Tower 2, Singapore. | 275.275 | 278.245 | 4235 |
| 6 | Outspan | To Order | Olam Int. Ltd., 9 Temasek Blvd., 11-02 Suntec Tower 2, Singapore. | 300.300 | 303.540 | 4620 |
| | | | Totals: | 3865.637 | 3881.677 | 58520 |

Contd/...

With respect to the above, I add that Olam International Limited is a major international cocoa trader, as well as trading in other agricultural commodities, who appear to have sold their portion of cargo onwards to Dogu-Bati, the eventual Turkish Receiver. However, true title to the cargo remains unclear since the original Bills of Lading were not presented to the Master but instead, the cargo was discharged under a Letter of Indemnity issued by the Charterers.

Additionally, closer inspection reveals an anomaly between Bills of Lading Nos. 2 and 3, which state the same number of bags in each parcel – both purportedly of 11550 bags each – but with different net and gross weights. Indeed, in each of the three SAF-Cacao parcels (Nos. 2, 3 and 4) if the net weight is divided by the number of bags then the net weight per bag does not equate to 65kg but to bags of net weight of 66.05, 65.69 and 65.96kg respectively, for Bills of Ladings Nos. 2, 3 and 4.

## 2. Events During Our Attendance.

### 2.1    Onboard Inspections Conducted at Ambarli During Discharge.

2.1.1    Initial Inspection.

On the morning of 16th May, I attended onboard LIBERTAS whilst moored alongside in the port of Ambarli and conducted an inspection of the accessible cargo stows in all three holds. Throughout this, and subsequent attendances, I was accompanied by Mr Turan Ozcan, Owners' locally appointed P & I surveyor from Artera Survey Bureau.

At the time of this first inspection, discharge was in progress from holds Nos. 2 and 3 with two gangs using slings attached to the ship's cranes with no discharge of cargo from hold No. 1 having taken place.

BROOKES BELL                                                                                  CONTINUATION

- 5 -

B072357                                                                                          LIBERTAS

The jute sacks of cocoa, each of about 65kg in weight, were offloaded onto road trucks and manually stacked for delivery to the Receiver's warehouses. A degree of spillage was noted on the quayside (see **Appendix No. 6, Photographs Nos. 40 - 41**) as a result of splits in some bags caused primarily by parts of the jute fabric being rotten and disintegrating under the strain. No obvious attempt to segregate stained, water damaged bags appeared to in operation.

a) Holds Nos. 2 and 3.

In the aft part of holds Nos. 2 and 3, evidence of water ingress through the hatch covers was noted, with portions of the bags located directly underneath the aft hatch coamings in these holds appearing rotten, blackened and in poor condition (see **Photographs Nos. 1, 9 & 10, Appendix No. 6**). Additionally in both these holds, evidence of water ingress was noted directly underneath the forward starboard side ventilator opening, with bags in these locations blackened, rotten and obviously water damaged (see **Photographs Nos. 2, 11, 13 & 14 and 19 - 20 & 27, Appendix No. 6**). However, the total number of such bags appeared to be small.

Samples of the rotten jute and cocoa beans were taken from all four affected areas and retained for testing for the presence of chlorides. Mr Ozcan reported that he had conducted testing with silver nitrate on some of the bags in the uppermost tiers after the holds had been opened. In some cases, his tests proved positive for the presence of chlorides suggesting that some seawater had caused wetting to bags in the hatch square in the locations mentioned above but in the majority of cases, the tests were negative indicating freshwater wetting.

In many areas of the stows in these two holds, water damaged bags were noted adjacent to the shell plate (see for example **Photographs Nos. 3 - 8 & 15 - 16, and 23 - 25 & 28 - 29, Appendix No. 6**) and other metal surfaces in the peripheries of the stow, such as the horizontal plating supporting the ship's cranes (see **Photograph No. 28, Appendix No. 6**). Although the former wetting was by this stage dry, the bags appeared stained, and in some

BROOKES BELL                                                    CONTINUATION

- 6 -

B072357                                                         LIBERTAS

cases rotten with the contents partly mouldy. Given the fact that such bags were in the peripheries of the stow and not within the bulk of the cargo, it is most probable that such wetting arose due to ship's sweat.

Additionally, within the stows some bags were noted with obviously caked contents but without staining indicating that they had not been wetted whilst onboard (see **Photograph No. 39, Appendix No. 6**). In a number of cases, these bags were cut open and their contents examined revealing the beans to be visibly mouldy and caked / agglomerated to varying degrees. This suggests that such bags had displayed microbiological instability and undergone microbiological proliferation / heating whilst within the stows.

b) Hold No. 1.

Since no discharge had taken place from hold No. 1, it was not possible to assess accurately the condition of the cargo stow in this hold at the time of this inspection. However, the same lack of proper / adequate dunnaging was apparent and likewise, some staining of the jute bags was visible in the accessible uppermost tier of bags (see **Photographs Nos. 29, 31 to 32, Appendix No. 6**). In this hold I selected a very small number of cocoa beans at random from apparently sound bags and cut them open lengthways. In a number of cases, evidence of mould growth was noted inside the beans with yellow and white mould apparent (see **Photographs Nos. 35 to 38, Appendix No. 6**). This raises questions concerning the quality of the beans at the time of shipment, as indeed does the fact that some bags had suffered caking.

As a consequence of the fumigation conducted at the anchorage in Istanbul with phosphine gas between the 8th and 13th May, no live insects were noted in or around any of the cargo stows. However, a large number of dead moths and beetles were found on the cargo in all holds during the course of our inspection.

- 7 -

### 2.1.2    Summary of Additional Onboard Inspections.

Generally in holds Nos. 2 and 3, stained and water (sweat) damaged bags of cocoa were noted where they had contacted the steel surfaces of the holds, such as the shell plate, frames and stiffeners. This wetting had caused the jute fabric of the bags to rot, resulting often in spillage of the contents of such affected bags as soon as attempts were made to move them for the purpose of discharge (see **Photographs Nos. 53 and 74, Appendix No. 6**).

Inadequate dunnaging was noted and photographically documented in all holds although the extent of wetting by condensation appeared greatest in holds Nos. 2 and 3, compared to hold No. 1 (see **Photographs Nos. 89 to 94, Appendix No. 6**).

On the tank tops of all three holds, a layer of plywood had been laid directly onto the steel and the wood then covered by a layer of Kraft paper (see **Photograph No. 42, Appendix No. 6**). It was noted in all three holds that the undersides of the bags in the first tier were damaged being damp to the touch with a reasonably solidly caked layer of beans and strong musty smell typical of mouldiness / microbiological deterioration to the beans in the bags. In extreme cases, the jute was completely rotten and the contents caked and mouldy (see **Photographs Nos. 46 – 52, 54-56, 71 – 73, and 75 - 77, Appendix No. 6**). A number of such bags were carefully turned over and the jute cut to reveal the cocoa beans inside. As will be noted from the photographs, these were found to be mouldy and caked together, a phenomenon caused by fungal growth into the spaces between the beans thereby 'gluing' them loosely together (see **Photographs Nos. 48 – 52 and 55 - 56, Appendix No. 6**).

Elsewhere within the bulk stow in holds Nos. 2 and 3, and to a lesser extent in hold No. 1, the jute bags generally appeared without external staining but in many cases caked and lumpy (see **Photographs Nos. 69 – 71, and 78 - 80, Appendix No. 6**). The degree of caking varied with examples of soft caking which broke-up simply with handling, and others with harder caking which persisted even after the bags had been thrown around. The

BROOKES BELL                                                    CONTINUATION

- 8 -

B072357                                                              LIBERTAS

location of these affected bags appeared concentrated in the mid to lower sections of the stows in all holds, with the level of incidence also varying from almost every bag in some areas to perhaps one bag in three in others. Again cutting a number of such affected bags open and examining the cocoa beans inside revealed internal mould growth and deterioration.

As noted in the initial inspections, a small number of water damaged bags were identified by way of the aft hatch coaming and under the forward starboard side ventilator openings in holds Nos. 2 and 3. During the course of discharge, no new areas of water ingress were noted in any of the holds.

Examination of the ventilator openings and in particular their rubber sealing gaskets and some of the hatch covers panels where accessible, revealed that the seal to the forward starboard side ventilator to hold No. 2 had some sections missing as did one of the hatch cover panels (see **Photographs Nos. 82 and 83, Appendix No. 6**). The condition of the seal to the same ventilation opening relating for hold No. 3 appeared complete, but as there was some water damage directly underneath, it was evident that it could not form a satisfactory barrier to water penetration for whatever reason. I estimated that the total number of bags in holds Nos. 2 and 3 wetted by seawater ingress, and hence by the vessel, amounted to about 100 sacks in total. Ultimately, the ARTERA tallymen attributed 66 bags as having been wetted by seawater ingress in these areas although these were not specifically segregated from other water damaged bags.

As will be seen below, the Receivers reportedly attempted to have all the damaged bags delivered to the Catalca warehouse in the Free Zone area, and to so this would require a degree of segregation to be conducted onboard the vessel. However, I am unaware of any specific onboard segregation operation and the bags were simply placed onto slings and then lifted out of the holds onto awaiting road trucks.

Contd/...

BROOKES BELL                                                              CONTINUATION

- 9 -

B072357                                                                      LIBERTAS

## 2.2    Warehouse Inspections.

Two inspections were conducted at the Receiver's warehouses, on 17th and 24th May, and I provide brief details below:

On the afternoon of 17th May, Mr Ozcan and Mr Ahmet Bozkurt (from Omur Marine – the Owners' P & I Club's local correspondent) and I visited the Catalca warehouse within the Istanbul Trakya Free Zone Area owned/operated by Ideal Gida. The resident manager was Mr Nuri Gevik who showed us two areas where the segregated cargo was being stored and a third section for sound cargo. This warehouse had two floors and the intention had been to store all the bags from the peripheries of the stows from all three holds, together in the lower section. However, because the number had exceeded the Receiver's initial estimates, they had been forced to store some damaged bags in the upper level as well. He said that they were trying to have all the damaged bags delivered to this warehouse rather than the Akkim warehouse in Hadimkoy, but that this was difficult to ensure and a few damaged bags had been inadvertently sent there.

The cargo had been palletized on arrival with 21 of the 65kg jute sacks on each pallet, and consequently each pallet of about 1.5MT. The pallets had been stacked with small ventilation channels between each row. We were informed that they had segregated a total of 5,110 bags with external staining, with 3,280 bags in the lower level and the remainder in the upper part of the warehouse adjacent to the apparently sound cargo (see **Photographs Nos. 57 to 61, Appendix No. 6**).

In the upper section of the warehouse, next to the parcel of 1,830 bags of segregated cargo, there was a further stow of sacks of cocoa from a previous vessel (see **Photographs Nos. 61 to 63, Appendix No. 6**). These appeared to be in very similar condition to the cargo from LIBERTAS and when asked about them, Mr Gevik stated that they were sweat/water damaged bags received in the previous shipment from Cote D'Ivoire. I was also told by Mr Bozkurt, who had to translate all the conversations for me since Mr Gevik spoke little or no

Contd/...

BROOKES BELL                                                        CONTINUATION

- 10 -

B072357                                                                  LIBERTAS

English, that Mr Gevik said he had been expecting damage to the cargo onboard LIBERTAS due to the delay in arrival / length of voyage. I pointed out that it is not uncommon for cocoa to be in storage in Africa for quite a while before shipment and that therefore delay was not necessarily a factor in causation in this case. It is clear from his comments, I believe, that sweat damage is not uncommonly encountered by the receivers particularly when the voyage is prolonged for whatever reason. Of course if proper dunnaging was employed in these shipments, then the occurrence of sweat ought not to result in cargo damage other than perhaps to some bags in the uppermost tier in each hold.

Before leaving the warehouse, we asked where the Underwriter's surveyors were since we had been informed that they were in the warehouse inspecting the cargo as well as assisting in segregation. We were told that they had attended briefly on the first day to take some photographs and make a video but that Mr Gevik did not expect to see them again until after completion of discharge - in accordance with their usual operating practice. We commented on the fact that they had not attended during discharge at all onboard the vessel.

We then went to the Akkim warehouse located in Hadimkoy, about 10km from the Free Zone Area (see **Photographs Nos. 64 to 68, Appendix No. 6**). Again, the cargo was palletised in the same manner with 21 sacks per pallet. Out of the cargo so far received, 430 bags, equivalent to about 28 MT had been segregated with the majority of the 700 MT present in the warehouse in apparently unstained bags and sound condition. We were told that a further 600 MT of cocoa would be stored here with any remaining cargo sent to the Free Zone Area warehouse.

On 24th May I re-attended at the Receiver's warehouses, commencing with the larger store in the Free Zone area. Present for this supposed joint inspection were:

Contd/...

BROOKES BELL                                                                                    CONTINUATION

- 11 -

B072357                                                                                              LIBERTAS

Mr Ozcan – the local P & I surveyor,

Mr Demir – the Underwriter's surveyor,

Mr Gevic – the warehouse manager,

Messrs. Diziciler and Salim – both logistic managers from Ulker, the Receivers,

The undersigned.

Before commencing with the inspection, Mr Gevic reported that there were a total of 37824 bags in the warehouse excluding the 1047 bags containing hold sweepings.  Out of these 37824 bags, 5861 had been segregated as damaged giving a total for visually sound bags of 31963.  The damaged bags had been stored in two locations – 3280 on the lower floor and 2581 on the upper floor.  The sweepings were also stored in the lower floor as were three truck loads of sound cargo.

Mr Ozcan and I then commenced with sampling the various parcels of cargo. Mr Demir refused to jointly participate although the reason for his objection was not explained to me. However, I noted Mr Demir taking a few spot samples of heavily water damaged beans from bags with holes in them due to the jute having become rotten.  He insisted on continuingly highlighting obviously damaged bags rather than examining or sampling partially stained or unstained bags which had been segregated as damaged.

Since the Receivers quality control staff had sampled in this warehouse the previous evening and the holes in the bags made by their sampling spear were obvious, it was decided to use the same points to obtain effectively identical samples as they would have drawn.  In addition, further samples were also taken from previously un-sampled bags.  I have summarised the details of the sampling in the table below for convenience, with sample Nos. 1 to 8 being from the Free Zone warehouse, and Nos. 9 to 11 drawn at the Akkim warehouse in Hadimkoy:

Contd/...

CONTINUATION

- 12 -

B072357                                                                    LIBERTAS

| Sample No. | Description | No. Bags Sampled | Warehouse |
|---|---|---|---|
| 1 | Segregated damaged bags on lower floor, sampled in same place as Receivers QC personnel. | 29 | Free Zone |
| 2 | Segregated damaged bags on lower floor, sampled in different bags than Receivers QC personnel. | 50 | Free Zone |
| 3 | Sweepings sampled in same place as Receivers QC personnel (18 bags) plus two additional bags. | 20 | Free Zone |
| 4 | Sound cargo on lower floor. | 19 | Free Zone |
| 5 | Sample from 7 sound, unstained bags taken from 3rd pallet which had been selected by Mr Demir. | 7 | Free Zone |
| 6 | Damaged cargo stored on upper floor. Bags sampled were same as Receivers, plus additional bags. Noteworthy that Receivers QC personnel exclusively sampled in stained areas of the bags. | 48 | Free Zone |
| 7 | Sound cargo on upper floor sampled in same bags as Receivers QC personnel. | 62 | Free Zone |
| 8 | Repeated samples from just 2 caked bags. | 2 | Free Zone |
| 9 | Damaged, segregated bags. | 55 | Akkim |
| 10 | Sound cargo stored on the LHS of the warehouse. | 50 | Akkim |
| 11 | Sound cargo stored on the RHS of the warehouse. | 50 | Akkim |

After completion of sampling on the lower floor, attention switched to the condition of the segregated bags on some of the pallets. Two pallets were selected by the Ulker staff, primarily on ease of access and brought down to floor level by Mr Gevic using a fork-lift. The bags were pulled off the first pallet and spread out on the floor so that their condition in terms of obvious staining, which I add was the basis upon which the segregation had been conducted, could be checked.

In the first pallet examined, numerous bags with no obvious or visible staining had been stacked along with bags with very noticeable staining / rotten jute (see **Photographs Nos. 95 to 97, Appendix No. 6**). Again, Mr Demir seemed solely interested in the obviously damaged bags and needlessly pointed these bags out to me rather than trying to assess the overall condition of the segregated cargo. I stated that I was fully aware of the presence of damaged bags as I had been in attendance daily on the ship, unlike himself, and had conducted many inspections inside the cargo holds.

Given the presence of sound, non-stained bags on pallets containing segregated, allegedly damaged sacks, I asked him and the attending Ulker representatives to explain to me on what basis bags with no external staining had been segregated as damaged, and why they were thus being claimed for despite a lack of evidence to suggest that they were actually affected in any way.  Mr Diziciler said that they had come from the top of the stows and would have been sweat damaged.  I refuted this on the basis that during the course of discharge bags would naturally become admixed both onboard the vessel by the stevedores in the holds, during loading onto the road trucks and of course during the palletisation process in the store.  He then suggested that perhaps the jute had dried out and thus lost any discolouration/staining that they might have originally had.  I stated that this was not possible since once wetted, jute more or less immediately and, more importantly, permanently became stained.

Mr Diziciler then said that they couldn't be sure that the contents of the bags were not damaged and asked whether I expected them to use bags from the same pallet which had very obviously damaged cargo on it. I pointed out to him that in regard to apparently sound bags, it could be the case that the contents were damaged prior to packing and thus the point he made about not knowing the condition of the contents of the sacks of cocoa that they received could well be said of any of the cargoes they took delivery of.  In respect to his comment that they couldn't use apparently sound bags stacked on the same pallet as damaged ones, I reiterated the fact that there was no relationship between stowage position within the stows onboard and that on the pallets in the warehouses.  In light of their concern, I proposed that they should re-sort all the cargo and then re-sample the bags with no visible external staining.  They said that they would await the results of the sampling already conducted and the analysis of those samples, but I pointed out that the presence of clearly damaged bags which had been sampled along with the apparently sound ones, would 'downgrade' the overall sample and thus that it would be better to do as I suggested, i.e. re-sort and re-sample just the visibly unaffected bags.

BROOKES BELL                                                                    CONTINUATION

- 14 -

B072357                                                                         LIBERTAS

I then examined the second pallet and found a similar situation to the first, with sound and damaged bags mixed together on the same pallet (see **Photographs Nos. 98 to 102, Appendix No. 6**).

Mr Demir and the Ulker staff then decided to investigate another pallet in an attempt to justify their segregation. After Mr Demir had selected a likely candidate, it was brought down from the second tier of pallets and placed on the floor of the warehouse (see **Photograph No. 103 to 104, Appendix No. 6**). Together with Mr Gevic, I again took the bags off the pallet and spread them out on the warehouse floor (see **Photographs Nos. 105 to 115, Appendix No. 6**). In total, 7 out of the 21 bags on the pallets had no visible staining, or with very marginal / questionable marks, with the remainder having variable degrees of staining and others split open due to the rotten jute fabric of the bags (see **Photographs Nos. 106, 109 and 112, Appendix No. 6**). This again highlighted the need for better segregation and assessment of the extent of damage in each bag, and I suggested that they should try and segregated the bags according to the extent of visible damage.

After drawing samples from the other parcels of cargo on the lower floor, Messrs. Ozcan and Gevic and I went upstairs to the remaining cargo where samples were drawn from sound and damaged parcels, as well as from two caked bags (see **Photographs Nos. 116 and 117, Appendix No. 6**). We were later rejoined by Mr Demir and the Ulker representatives, and Mr Demir again insisted on bringing to my attention one or two bags, within the stow of thousands of apparently sound bags, which had some degree of staining. I told him that the presence of one or two bags was not particularly surprising given that so many bags had to be checked and that it was inevitable a few would escape through the segregation process. In any event, I had already recorded their presence in the stow but brought to his attention the fact that overall, there were many more sound bags admixed and segregated as damaged than there were damaged bags admixed with visually sound ones.

BROOKES BELL
- 15 -
CONTINUATION

B072357
LIBERTAS

Following inspection at this warehouse, we proceeded to the Akkim store in Hadimkoy where a total of 20,020 sound bags had been received along with 597 apparently with visible staining (see **Photographs Nos. 118 to 119, Appendix No. 6**). Again, a number of bags with little or no staining were visible in the stow of damaged bags, but generally the segregation here seemed to have been conducted a little better (see **Photograph No. 119, Appendix No. 6**). Samples were then drawn as described above from 55 of these bags and then from 100 of the sound bags in the sound cargo stows. No previous signs of sampling at this warehouse were visible in the bags indicating that the Receiver's QC staff had not yet visited this store.

## 3. Causation.

### 3.1     Seawater Ingress.

It should be noted that the hatch covers were reportedly subjected to a hose test and found in good order with no evidence of leakage prior to the commencement of loading (see Statement of Facts for San Pedro, **Appendix No. 1**). However, the vessel encountered heavy weather with winds up to Force 10/11 in the period 22nd to 25th March and as a consequence some ingress occurred with four minor areas of water ingress found during the course of discharge. These were located in holds Nos. 2 and 3 along the aft portside hatch coamings and under the forward starboard-side ventilator openings. Close inspection of the rubber seals to some of the hatch covers and the starboard side ventilator openings revealed some deficiencies which were likely to have been the source of the ingresses during heavy weather.

Contd/...

B072357

Testing the bags for the presence of chloride with silver nitrate solution proved positive in these areas but negative in all other areas of the cargo stows. I estimated the number of affected bags to be in the region of 100 to 200 bags but a more definitive count, made during discharge by surveyors and the tallyman appointed by ARTERA, determined the precise number of seawater damaged bags to be 66 with a net weight of about 4.5 MT.

The allegation that all the water stained bags were damaged as a result of wetting by seawater is inconsistent with the analytical results obtained upon the jute and cocoa bean samples taken from the cargo stows. Additionally, it is not supported by the results of the extensive silver nitrate testing conducted jointly by Mr Ozcan and ourselves, the vast majority of which were negative for the presence of chloride.

In hold No. 2, 11 samples of jute sacking and/or cocoa beans were removed from water damaged bags located around the periphery of the stow at the bottom of the hold. In addition, samples of jute were taken from a damp / mouldy bag lying on the plywood and Kraft paper dunnaging on the tank top of hold No. 1, and from one sound bag in the second tier located immediately above it. Salamon & Seaber conducted analysis for the presence of chlorides in all these samples, as well as in samples taken from the upper areas of the stows in holds Nos. 2 and 3 identified as having been damaged by possible seawater ingress through the hatch coamings and ventilator openings. The results (see **Appendix No. 7**) obtained are summarised below:

BROOKES BELL                                                              CONTINUATION

- 17 -

B072357                                                                        LIBERTAS

| Sample No. | Hold No. | Origin/Description | Chloride Conc. (ppm) |
|---|---|---|---|
| 1 | 2 | Centre of forward bulkhead. | 100 |
| 2 | 2 | Forward starboard side. | 200 |
| 3 | 2 | Forward of mid-point on starboard side. | 100 |
| 4 | 2 | Aft of mid-point on starboard side. | 200 |
| 5 | 2 | Aft starboard side. | 300 |
| 6 | 2 | Starboard side of aft bulkhead. | 200 |
| 7 | 2 | Port side of aft bulkhead. | 4000 |
| 8 | 2 | Aft of mid-point on portside. | 300 |
| 9 | 2 | Forward of mid-point on portside. | 500 |
| 10 | 2 | Forward portside. | 100 |
| 11 | 2 | Portside of forward bulkhead. | 300 |
|  | 1 | Sample from underside of damp bag in bottom-most tier. | 100 |
|  | 1 | Sample from bag in 2nd to bottom tier. | 100 |
|  | 2 | Cocoa from forward starboard side corner in area of possible seawater ingress under vent opening. | 500 |
|  | 2 | Cocoa from aft starboard-side in area of possible seawater ingress. | 500 |
|  | 3 | Cocoa from forward starboard-side in area of possible seawater ingress under ventilator. | 300 |
|  | 3 | Cocoa from aft portside in area of possible seawater ingress. | 100 |

It should be noted that the concentration of chloride in seawater is about 18980 ppm and the levels determined above, with the exception of sample No. 7 which was located in an area directly beneath the ingress through the aft portside of the hatch coaming, indicate extremely low levels of chloride which are inconsistent with seawater wetting.

If we consider the sound bag with no external staining from the second from bottom tier as a control sample, then the background chloride level in the cargo/jute is about 100ppm. On this basis, review of the other reported chloride concentrations indicates insignificant levels of chloride from which it is reasonable to conclude from these results that the vast majority of wetting to cargo onboard LIBERTAS arose due to fresh water. Based on the location of the affected bags, this freshwater would have been the result of condensation (ship's sweat).

### 3.2      Ships' Sweat.

As has been discussed, many of the bags in the peripheries of the stow were found to have been affected by wetting with condensation i.e. ship's sweat.  This was already noted in the accessible uppermost tier of bags during the attendance of my colleague, Dr Martin Jonas, on 25th April during the vessel's stay at Malta.  It is clear therefore that conditions must have arisen at some stage prior to this for development of significant sweat.

One method of controlling sweat formation is to apply ventilation, but it should be noted that ventilation generally cannot reach all parts of the stow and that even in those parts within reach of the ventilating air, even correctly applied ventilation is unable to prevent condensation from occurring under certain situations – such as in the case of a self-heating cargo as I shall discuss below.

One ventilation rule, known as the 'three degree rule', is to apply ventilation if the ambient temperature drops more than three degrees below the cargo temperature.

In this case, the prevailing ambient temperature at the load-port was around 30°C and it is likely that the cargo would have been at a similar temperature.  The ventilation and temperature records contained in the Deck Log indicate that almost as soon as the vessel departed San Pedro, such as the period commencing after the first week, the air temperature fell to the low twenties and the risk of sweat would have increased.  The ambient air temperature then dropped further to between 14 and 15°C around the first week of April.  This latter period was reportedly accompanied by rain such that ventilation could not be applied without the risk of water damage occurring to the cargo.

Once condensation formed on the shell plate and undersides of the hatch covers, it would have had the potential to cause wetting to any bags in contact with the steel of the holds or in the uppermost layer of bags through drips 'raining' down from above.  Such wetting is clearly limited to the periphery of the stow and would not have been able to cause wetting to bags within the stows.  Had the cargo been properly stowed in the holds with

Contd/...

BROOKES BELL                                                              CONTINUATION

. 

- 19 -

B072357                                                                  LIBERTAS

appropriately placed dunnaging, wetting to the periphery of the stow would have been prevented, with the exception of bags in the top of the stow.

**3.3        Stowage and Dunnaging.**

The purpose of dunnaging is to protect the cargo from contact with the metal structures of the holds and to thereby prevent possible damage to the cargo through wetting by condensation, should condensation occur during the voyage or from the cargo becoming dirty. The effect of ventilation is limited to the parts of the stow within reach of ventilation air. This will vary somewhat from vessel to vessel depending on the layout of the ventilators, but is generally restricted to the headspace above the cargo surface and nearby cargo. Ship's sweat formation in areas away from the reach of the ventilators, such as at the lower parts of the side plating, cannot be prevented by ventilation, but consequential cargo damage can be minimised by adequate dunnage preventing the condensing moisture from coming into contact with the cargo. In the case of a break bulk cargo, dunnaging usually takes the form of wooden battens together with mats and/or plywood placed between the sacks and the metal work to maintain a gap the peripheries of the stow as it is built-up during loading. Additionally, Kraft paper is used to keep the sacks clean rather than to prevent wetting. Dunnaging should also be used even up into the hatch coaming, since condensation can form on any exposed internal metal surface providing conditions are favourable for it.

In respect to stowage and dunnaging, the voyage Charter Party states in Clause 25:

*"The cargo is to be loaded under deck and dunnage a/o kraft paper a/o plywood for cargo protection in hold for charts' act and responsibilities."*

It was clear throughout the course of discharge that the dunnaging placed in the holds during loading was totally inadequate for the intended purpose, with only about 40 pieces of battening removed from each hold upon completion of discharge (see **Photographs Nos. 89 to 94, Appendix No. 6**). Indeed, the Master brought to the attention of all concerned

parties during loading in San Pedro that the dunnaging was insufficient by way of two protest letters (see **Appendix No. 8**), dated 7th and 8th March. In addition, it is clear from the Sales Invoice presented to the Master at San Pedro, that apart from Kraft paper and the plywood, no battens had been requested by the Charterers (see **Appendix No. 9**). It is therefore unclear where the limited number of battens, noted in each hold, originated from although these may have been the vessel's own small supply.

As a consequence, many bags in the peripheries of the stow were found to be touching the metal work and had become wetted through the thin layer of Kraft paper which provided the only protection to the cargo from condensation which had formed on the steel.

## 3.4     Self-heating.

Self-heating is the term used to describe shipments of agricultural products which are undergoing heating as a result of microbiological activity within the cargo. This process specifically involves proliferation, and consequential metabolic heat production, of the ubiquitous storage fungi present on all stored agricultural products. Such fungal proliferation / mould growth requires the relative equilibrium humidity (ERH) of the interstitial air within the cargo to reach levels of about 70%. Below this level, growth of the storage fungi cannot generally occur.

It should be noted that the ERH within the cargo is determined by the moisture content of the commodity and its temperature. In the case of cocoa, it is accepted that instability arises if the moisture content of the cargo exceeds about 7.5% by weight (see **Appendix No. 10**).

Usually accompanying self-heating is caking or agglomeration of the beans, as a result of fungal growth into the gaps between the individual beans thereby effectively 'sticking' them together. I inspected various parts of the cargo to try and assess the extent of caking within the stows, and although based on comparatively small numbers of bags examined,

the results below indicate that in some areas of the stow a high percentage of bags were found with internal caking, as indeed is revealed in the photographs:

| Hold No. | Area of Stow | No. Bags Checked. | No. Bags Caked | % |
|----------|--------------|-------------------|----------------|---|
| 2 | Starboard aft. | 87 | 32 | 37 |
| 3 | Starboard side | 30 | 17 | 57 |
| 3 | Central lower aft part. | 18 | 13 | 72 |
| 3 | Starboard aft lower part. | 21 | 16 | 76 |

In addition, the establishment of a temperature gradient, with the inside of the stow being warmer than the peripheries, causes moisture migration from the warmer, more humid areas to colder ones.

When such instability occurs in grain shipments, it is often accompanied by a rise in the temperature of the cargo due to the metabolic heat generation of the storage fungi and the fact that grain is a good insulator, trapping any heat produced within the stow. However, in this case, only comparatively modest increases in the temperature of such affected parts of the stows were noted. This is probably due to the beans being stowed break-bulk, combined with their irregular shape and size which will mean that they pack less well together with the consequence that they are a less good insulator compared to grain.

### 3.5     Length of Voyage.

Due to the engine problems experienced by LIBERTAS and possibly other causes, the voyage was about 1 month longer than usual. However, had the cargo been microbiologically stable i.e. loaded with a sufficiently low enough moisture content such that no microbiological proliferation occurred within the stows, then the length of the voyage would have been irrelevant. The possible exception to this may have been the need for the fumigation, which was conducted prior to berthing in Ambarli. It is unclear to

BROOKES BELL

- 22 -

B072357

what extent insect infestation was already present at time of loading, and to what extent it worsened over the course of the voyage.

### 3.6    Ventilation.

The record of ventilation applied during the voyage is annotated in the Deck Log (see **Appendix No. 11**) and for convenience summarised as an abstracted ventilation table (see **Appendix No. 12**).  On the basis of these documents, ventilation was generally applied during daytime hours to the cargo holds as and when the weather permitted.

## 4. Cocoa Bean Quality.

### 4.1    Quality Factors for Cocoa Beans.

The production of cocoa beans is a complex process and one in which standardisation of practices in order to obtain a product of consistent and uniform quality is recognised as being very difficult to achieve.

To illustrate this, I will provide a very brief over-view of the production process before illustrating the areas where variability in the quality of the beans arises:

After harvesting of the cocoa pods from the trees, the pods are opened and the sweat pulp and cocoa beans are scrapped out.  The resulting mixture is then allowed to simply stand in a pile on the ground and to undergo fermentation, a process which results in the development of the typical 'chocolate' flavours within the beans.  Without such fermentation, these flavours do not develop.  The beans are then dried and roasted.

The quality of the beans obtained depends upon many factors such as;

Contd/...

CONTINUATION

LIBERTAS

i).     the ripeness of the pods at the time of harvesting - for best quality they should still be green since lower quality beans will be obtained if they are orangey/red,

ii).    the fermentation process of the pulp and beans - they can be under-fermented, and over-fermented, with the length of time and tempeature of fermentation being the main determining factors,

iii).   the drying process - air dried in thin layers or air dried with the beans in a pile or even machine dried results in measurable diferences in quality, and

iv).    the roasting stage.

As may be appreciated from the above, individually these are all simple stages but whch when considered together have a complex role to play in determining the final quality of the beans produced.

The fermentation process by definition involves microbes (yeasts) and consequently the beans are naturally exposed to such micro-organisms during processing. It is therefore not unusual for the beans to have some external signs of mouldiness and this generally causes little concern to the end-users. What is usually of more significance for chocolate producers, is the occurrence of moulds inside the beans since these can impart 'off' flavours and it is the so called 'cut test' which is used to determine/evaluate this aspect of cocoa bean quality. That being said, modern processing plants can even deal with cocoa which has internal mouldiness, although care must be taken to control / avoid any 'off' flavours which can be attributable to such moulds.

**4.2     Evaluation of Cocoa Bean Quality.**

Many factors associated with cocoa bean quality are subjective and relate to taste and olfactory stimuli possessed by the beans. For determination of these factors, a small portion of the beans have to be partially processed and the resulting cocoa butter evaluated by expert 'tasters'.

Contd/...

BROOKES BELL

CONTINUATION

- 24 -

B072357

LIBERTAS

More tangible approaches to quality determination utilise the cut test and chemical profiling of the beans, such as the determination of the free fatty acid (FFA) content of the beans. It should be noted that the FFA content of oil and fat bearing seeds, of which cocoa beans are an example, provides a measure of the extent of deterioration of the triglycerides which are the chemical constituents of the oil/fat. They thus provide an indication of the quality of that oil/fat. In short, the lower the FFA content, the higher the quality of the fat.

Ideally, fresh cocoa beans should not contain more than about 1.0% FFA content but this level will increase progressively following harvest. There are many factors which play a role in determining the FFA content of cocoa beans, but the main ones are concerned with the post-harvest treatment of the beans, such as the length of time the beans are left in the pod and the exposure to heat and moisture during fermentation and drying. In Robin Dand's "The International Cocoa Trade" published by CRC Press, 2007 2nd edition (see **Appendix No. 13**), it states on page 253 that:

*"High levels of FFA occur in cocoa that is either improperly stored for a long time (i.e. too hot and high moisture) and/or the result of the activity of bacteria or mould in cocoa. In particular the action of the enzyme lipase (not only introduced by micro-biological activity but also present in the natural raw cocoa) acts to break down the triglyceride into separate groups of fatty acids and glycerol thereby "freeing" the fatty acids."*

Currently, no information is available concerning the quality of the beans shipped onboard LIBERTAS, such as their FFA and moisture content, or their condition at the time of loading.

**Analysis of LIBERTAS Cocoa Beans.**

In order to substantiate their claim, the quality control staff at Ulker released a report (see **Appendix No. 14**) with the results of their findings. These are summarised below for convenience:

BROOKES BELL                                                    CONTINUATION

- 25 -

B072357                                                              LIBERTAS

| | Cargo | Quantity (MT/Bags) | Moisture Content (%) | FFA Content (%) | Mouldy Beans (%) |
|---|---|---|---|---|---|
| Specification | - | - | 6.5 % Max. | 1.75 % Max. | 3 % Max. |
| TSE/Codex Limits | - | - | 7.5% Max. | 1.75% Max. | 4% Max. |
| | | | | | |
| Catalca Free Zone Warehouse. | Wet / Mould Damaged | 380.965 MT / 5,871 bags. | 7.37 | 6.75 | 72.53 |
| | Sweepings | 69.002 MT / 1,047 bags. | 9.47 | 6.10 | 68.50 |
| | Dry Goods | 2,077.595 MT / 31,963 bags. | 5.69 | 3.15 | 22.44 |
| Hadimkoy Akkim Warehouse. | Wet / Mould Damaged | 38.805 MT / 597 bags. | 7.48 | 8.82 | 66.33 |
| | Dry Goods | 1,262.495 MT / 19,423 bags. | 5.87 | 3.30 | 27.00 |

It will be noted from these results that none of the samples analysed, including those of sound bags with no external staining, were found to have FFA content within their declared specification of 1.75% maximum. I would comment that this level of FFA usually relates to the limit permissible for *cocoa butter* rather than for cocoa beans themselves and according to EEC legislation, it is illegal in Europe to sell *cocoa butter* with FFA content in excess of 1.75%.

In view of the allegation that the free fatty acid content was too high, the samples drawn in the Receiver's warehouses were submitted to GAFTA and FOSFA approved London based analysts, Salamon & Seaber, for independent determination of the FFA content.

The results obtained (see Certificates of Analysis, **Appendix No. 15**) are summarised in the table below for convenience:

Contd/...

BROOKES BELL                                                                    CONTINUATION

- 26 -

B072357                                                                              LIBERTAS

| Sample No. | Description | Warehouse | Moisture Content (%) | Free Fatty Acid Content (FFA %) |
|---|---|---|---|---|
| 1 | Segregated damaged bags on lower floor, sampled in same place as Receivers QC personnel. | Catalca Free Zone | 6.6 | 3.7 |
| 2 | Segregated damaged bags on lower floor, sampled in different bags than Receivers QC personnel. | ibid | 6.3 | 3.0 |
| 3 | Sweepings sampled in same place as Receivers QC personnel (18 bags) plus two additional bags. | ibid | 8.2 | 17.0 |
| 4 | Sound cargo on lower floor. | ibid | 6.5 | 7.5 |
| 5 | Sample from 7 sound, unstained bags taken from 3rd pallet which had been selected by Mr Demir. | ibid | 6.4 | 10.0 |
| 6 | Damaged cargo stored on upper floor. Bags sampled were same as Receivers, plus additional bags. Noteworthy that Receivers QC personnel exclusively sampled in stained areas of the bags. | ibid | 7.8 | 10.0 |
| 7 | Sound cargo on upper floor sampled in same bags as Receivers QC personnel. | ibid | 6.5 | 10.5 |
| 8 | Repeated samples from just 2 caked bags. | ibid | 6.8 | 4.5 |
| 9 | Damaged, segregated bags. | Hadimkoy Akkim | 6.8 | 5.2 |
| 10 | Sound cargo stored on the LHS of the warehouse. | ibid | 6.3 | 6.6 |
| 11 | Sound cargo stored on the RHS of the warehouse. | ibid | 6.7 | 13.0 |

Several points are apparent from these results:

i).       The FFA contents of all the samples exceed the reported specification of 1.75% (see below), with the lowest values of 3.0 and 3.7% being associated with the segregated allegedly damaged cargo in the lower floor of the Free Zone warehouse.

ii).      Unsurprisingly, the highest reported value was associated with the sweepings of spilt cargo which was bagged upon completion of discharge.  This cargo consisted at least in part of beans from split / disintegrated seawater and condensation (freshwater) wetted bags spilt during the course of discharge.

iii).     The levels of FFAs determined by Salamon & Seaber are noticeably higher than those reported by Ulker.  A possible exception to this is the segregated damaged cargo on the lower floor of the Catalca warehouse for which Salamon & Seaber obtained a value of

BROOKES BELL                                                      CONTINUATION

- 27 -

B072357                                                                LIBERTAS

3.0% FFA and Ulker 6.75%.  However, it may be that Ulker made a composite sample representing all of the allegedly damaged cargo, and thus an average of Salamon and Seaber results obtained for samples Nos. 1 and 6, which gives a value of $(3 + 10)/2 = 6.5\%$, might account for this difference.

iv).      There is no obvious explanation as to why Ulker obtained such low levels for the FFA contents of the apparently sound cargo sampled from unstained bags when Salamon and Seaber obtained significantly higher values.  This is particularly surprising when the fact that these bags were sampled in exactly the same places as Ulker by sampling in the holes (sample points) as the Ulker personnel.

**4.3      Mitigation.**

Ulker attempted to mitigate the damage to the cargo by sorting stained and unstained bags from each other.  However, it is apparent that:

i).      Segregation of bags on this basis was poorly done during transfer of the cargo from the ship to the warehouses, with about $1/3^{rd}$ of the bags segregated as 'stained' and hence 'damaged' being found to be unstained and in apparent sound condition during the final 'joint' inspection.

ii).      Analysis of the apparently sound cargo, with unstained bags and hence no apparent damage, revealed that in fact even this cargo was in poor condition with elevated FFA content and mould damaged beans.  This clearly indicates that the cargo was of low quality at the time of shipment.

iii).      In order to assist with mitigation, we were asked to contact salvage buyers and to obtain offers for the 480MT parcel of segregated 'damaged' cargo.  Subsequently, two international salvage buyers were contacted – Gerrard Bakker and Cargo Recovery Consultants Ltd. (CRC Ltd.) – and offers of €1,250-00 per MT (approximately US$1,850-00 per MT) obtained verbally.  Both of these buyers were sufficiently interested to have their local representatives visit the warehouses and inspect the cargo.

BROOKES BELL                                                          CONTINUATION

- 28 -

B072357                                                              LIBERTAS

iv).     With a sales invoice value of US$3,250.00 per MT (see **Appendix No. 16**), a salvage sale offer of US$1,850-00 per MT represents a loss of US$1,400 per MT.


## 5. Quantum.

The two primary Receivers, Dogu Bati San S.A. and Elittepe Kahvecilik A.S., reportedly submitted demands based which were based on the Ulker Quality Control Report discussed above.  This was on the basis that Ulker were the intended final Receivers / Consumers of the cocoa beans although as I have indicated already, proof of title to the cargo currently remains obscure.

I have summarised the demands, as forwarded to me by Omur Marine Ltd., below:

a). Elittepe Kahvecilik.

Cargo quantity: Net 1,301,300 kg.
Quantity of cargo delivered: 1,262,495 kg
Wet damaged cargo: 38,805 kg (597 bags)
38,805 x USD /kg 3.25 = USD 126,116.25 x 1.1 = USD 138,727
The useless part: 30 per cent
1,262,495 kg x 30 % = 378,748 kg
378,748 kg x USD 3.25 = USD 1,230,932 x 1.1= USD 1,354,025
TOTAL: USD 1,354,025 + USD 138,727 = **USD 1,492,753**

b). Dogu Bati

Net quantity of the cargo: 2,537,337 kg.
Delivered cargo: Net 2,527,562 kg.
Wet damaged cargo: 380,965 kg in 5,861 bags.
Sweepings (spilled from the wet damaged bags): 69,002 kg in 1,047 bags.
449,967 kg x USD 3.25 = USD 1,462,392 x 1.1 = USD 1,608,632
The useless part: 25 per cent
2,077,595 kg (31,963 bags) x 25 % = 519,398 kg.
519,398 kg x USD 3,25 = 1,688,045 x 1.1 = USD 1,856,850
TOTAL: USD 1,608,632 + USD 1,856,850 = **USD 3,465,482**

Contd/...

BROOKES BELL                                                    CONTINUATION

- 29 -

B072357                                                              LIBERTAS

I make the following points in relation to these demands:

**5.1      Water Damaged Cargo.**

It will be noted from the above that the claim for alleged water damaged cargo (plus 10%) amounts to $138727 and $1608632 respectively.  This is calculated as the full value of 488.772MT, plus an uplift of 10%, the rationale for which is unclear.

**Damage Attributable to the Ship.**

The vessel caused damage to 66 bags due to seawater ingress, which amounts to a quantity of 66 x 65kg = 4290kg.  With a value of US$3.25 per kg (plus 10%), amounts to $15337.

**Damage Caused By Improper Stowage / Sweat.**

The rest of the water damage, amounting to;

$$[(138,727 + 1608632) - 15337] = US\$1732022$$

resulted from improper stowage and condensation / sweat damage.

**Salvage Sale Recovery and Overall Loss.**

Assuming that the cargo claimed for by the Receivers as a total loss was actually sold to CRC or Gerrard Bakker at the price offered of €1.25 per kg, then this would lead to a recovery of;

$$488772kg \times \$1.99 \text{ per kg } (€1.25 \text{ per kg}) = US\$971465.$$

Consequently the overall loss caused by both categories of water damage (including the 10% uplift) would be;

$$= [(138,727 - 1,608,632) - 971,465] = \$775894.$$

BROOKES BELL                                                              CONTINUATION

- 30 -

B072357                                                                      LIBERTAS

### 5.2     'Useless Cargo'

Both Receivers have assigned an arbitrary depreciation (on the basis that these proportions of cargo are 'useless') to cargo segregated as sound of between 25 to 30% total sound value plus 10%. Overall, this generates claims of US$1354025 and $1856850 respectively.

It should be noted that there is no technical rationale for this since as physically, there is no actual 'usable' and 'unusable' fraction. Additionally, in the Ulker Qulaity Control Report, upon which these claims appear to be based, there is no technical information as to how these arbitrary depreciations were arrived at. Ultimately, it is probable that the Receivers will simply process the beans as if they were sound.

Although the Salamon & Seaber analysis reveals that the FFA content of all the shipment is high and that it is therefore of low overall quality, there is no evidence that the inferior quality of the shipment as a whole is attributable to the ship. Indeed, to the contrary, the fact that the cargo displayed clear evidence of microbiological instability indicates that it was of low quality prior to loading.

### 6. Summary.

My investigations onboard the vessel and at the Receivers' warehouses have established that:

i).     Minor seawater ingress arose as a result of bad weather experienced during the voyage. This caused damage to a combined total of 66 bags of cocoa in holds Nos. 2 and 3.

ii).     Sweat damage arose to a large number of bags stowed in the peripheries of the stows in holds Nos. 2 and 3, and to a much lesser extent in hold No. 1. This sweat damage

occurred due to poor stowage and improper dunnaging which resulted in contact between the bags and steelwork of the holds.

iii).    The sweat damage was exacerbated by microbiological instability within the cargo stows in holds Nos. 2 and 3, as evidenced by caking to the contents of many bags in the centre of these stows, all of which had no external water stains.  Such caking was largely absent from hold No. 1 where the sweat damage was negligible.

iv).    Chemical analysis of the free fatty acid content of the beans by Salamon & Seaber revealed all the cargo, including the apparently sound cargo from clean bags with no signs of water staining, to be high and the cargo to be of low quality.  Combined with the evidence of microbiological instability, the chemical analysis indicates that the shipment was of low quality prior to loading onboard the vessel.

v).    Damage to the 66 bags wetted by seawater ingress is attributable to the vessel but the ship could do nothing about the sweat damage arising from microbiological instability and improper dunnaging / stowage.

*Brookes Bell*

pp **Nicholas Crouch** BSC (HONS) MA DPHIL CCHEM MRSC MEMASAE
**Brookes Bell**

İSTANBUL DENİZCİLİK İHTİSAS MAHKEMESİNE

İhtiyati Tedbir Talebidir.

İhtiyati Tebir İsteyen : Doğu Batı Sanayi Ürünleri İhracat ve İthalat A.Ş ve Elittepe
Kahvecilik ve Gıda San. Tic. A.Ş.

Vekili          : Av. Ahmet Şirvan KILIÇ

Fulya Mahallesi, Denizhan Sokak. No: 3/A D: 6 34394
Mecidiyeköy-İSTANBUL

Karşı Taraf      : M/V Libertas Gemisi Donatanı DOPMAR SRL'ye İzafeten
Cerrahgil Gemi Hizmetleri ve Acenteliği A.Ş.

Cerrahgil İş Merkezi Abdi İpekçi Cad. No: 33 34367 Teşvikiye, Şişli-
İSTANBUL

İhtiyati Tedbir Konusu: Büyükçekmece 3. Asliye Hukuk Mahkemesi 2008/192 D.İş Delil
Tespitiyle de sabit olduğu üzere Taşıyanın yüke verdiği zarar
sebebiyle, Ambarlı-Kumport Limanı'nda bulunan ve zarara yol
açan Libertas isimli gemisinin seferden men edilmek suretiyle
hakkında ihtiyati tedbir kararı verilmesi talebidir.

Açıklamalar

1. Karşı taraf DOPMAR SRL (donatan)ın Fildişi Sahili'nin San Pedro Limanı'ndan
Marmara'da herhangi bir limana, Müvekkillerim Doğu Batı Sanayi Ürünleri
İhracat ve İthalat A.Ş. ve Elittepe Kahvecilik ve Gıda San.Tic. A.Ş.'e ait 3.879,677
tonluk kakao çekirdeği yükünü sözleşme hükümleri ekte örneği sunulan
konşimentoya istinaden taşımıştır.

2. Yükleme limanında taşıyan tarafından çekilen "hazırlık bildirimi" ve ekinde
sunulan "olay raporu"ndan da açıkça anlaşılacağı üzere yükün, adı geçen
gemiye yükleme işlemi 08.03.2008 tarihinde sona ermiş ve gemi yüküyle birlikte
aynı gün yola çıkmıştır. Aynı raporda boşaltma limanına tahmini varış zamanı
(ETA) 28.03.2008 olarak verilmiştir.

3. Boşaltma için verilen tahmini varış zamanının sefere çıkıldığında 28.03.2008
olarak verilmiş olmasına rağmen, bu zamana kadar sağlıklı bir ETA bildirimi
yapılmadığı gibi geminin başından geçen olaylar hakkında taşıyan tarafından
kesin bilgiler tarafımıza verilmemiştir. Adı geçen gemi donatanın iddiasına göre
motor arızası sebebiyle sefere devam edememiş ve bir römorkör tarafından, en
son 06.05.2008 tarihi için ETA bildirimli olarak, gemi Türk karasularına çekilmiş, Zirai

Karantina tarafından ilaçlamaya alınmış ve bu sebeple 14.05.2008 itibariyle boşaltma için Ambarlı Limanı'na ancak yanaşabilmiştir.

4. Yükte zarar oluşma ihtimalinin kuvvetli olması üzerine Büyükçekmece Nöbetçi Asliye Hukuk Mahkemesi'nden delil tespiti isteniş, 3. Asliye Hukuk Mahkemesi'nin 2008/192 D.İş Dosyası üzerinden bilirkişi tespiti yapılmış ve bilirkişi raporu dosyaya sunulmuştur. Anılan rapora göre Müvekkillerim yük sahiplerinin, uğramış olduğu zarar görüleceği gibi ciddi oranlardadır. Karşı tarafın yabancı olması ve geminin de yabancı bayraklı olması sebebiyle, uğranılan zararın tazminini sağlamak için geminin seferden alıkonulması gerekmektedir.

| | |
|---|---|
| Hukuki Nedenler | : HUMK, TTK ve diğer mevzuat. |
| Deliller | : Bilirkişi Raporu, Konşimento örnekleri, NOR bildirimi, ETA bildirimi, Yük manifestosu, Yükün müvekkillere ait olduğunu gösterir gümrük belgeleri ve diğer belgelerle, keşif, tanık ve diğer deliller. |
| İstem Sonucu | : Yukarıda açıklanan nedenlerle, Libertas gemisi hakkında seferden men kararı verilmesini saygıyla talep ederim. 21.05.2008 |

İhtiyati Tedbir İsteyenler Vekili

Av. Ahmet Şirvan KILIÇ

TO THE MARITIME AND ADMIRALTY COURT OF ISTANBUL


PRECAUTIONARY JUDGMENT REQUEST


Party requesting for Precautionary Judgment: Dogu Bati Sanayi Urunleri ve Ithalat A.S.
                                             And
                                             Elittepe Kahvecilik ve Gida San. Tic. A.S.


COUNSEL                          : Ahmet Sirvan Kilic
                                   Fulya Mah. Denizhan Sok. No. 3/A  D: 6
                                   34394 Mecidiyekoy / İstanbul


OPPONENT PARTY                   : Owners of M/V LIBERTAS, Dopmar Srl. c/o
                                   Cerrahgil Gemi Hizmetleri ve Acenteligi A.S.
                                   Cerrahgil Is Merkezi Abdi Ipekci Caddesi
                                   No. 33     34367 Tesvikiye Sisli / İstanbul


SUBJECT                          : As it is eviden with the report issued under file
number 2008/192 of Buyukcekmece Third Instance Court the M/V LIBERTAS needs to be
arrested at the port of Ambarli due to her causing damage to the cargo she has carried on
board.


EXPLANATIONS:

1. The opponent party, DOPMAR SRL ( owners) has carried the cargo of 3,879,677
   mtns of cocoa beans from the port of San Pedro to the port of any in Marmara under
   the Bills of Lading issued for the favour of our clients, Dogu Bati Sanayi Urunleri ve
   Ithalat A.S.and Elittepe Kahvecilik ve Gida San. Tic. A.S.
2. The Notice of Readiness issued by the owners at the port of loading and the attached
   summary of events clearly shows that the cargo was loaded on board the vessel on
   08.03.2008 and the vessel sailed with the cargo on board at the same date. The same
   report also gives and ETA of 28.03.2008.
3. The ETA for discharging was stated as 28.03.2008 at the time of loading however
   until this date, no clear ETA was given to my clients and we were not provided with

sufficient information by the owners concerning what was happening to the vessel. The owners of the vessel alleged that the vessel could not continue her voyage due to an engine breakdown and has to be towed to Turkish territorial waters by TUG with an ETA of 06.05.2008, she has been fumigated by Phytosanitary Authorities and could berth to Ambarli port on 14.05.2008.

4. As it was highly possible that the cargo was damaged, we have asked evidence determination from the Third Instance Court of Buyukcekmece and under the file number 2008/192 of the same court, a court survey has been performed and the report of experts has been submitted to the court. According to this report, my client receivers have sustained serious damaged. Considering that opponents are of foreign nature and the vessel is foreign flagged, for a security of our losses, the vessel needs to be arrested.

LEGAL GROUNDS : Turkish Procedural Code, Turkish Commercial Code and other relevant laws and Codes.

EVIDENCE          : The court appointed expert report, copies of the Bills of Lading, NOR, ETA, cargo manifest, customs documents showing that the cargo is owned by clients , other documents, survey, witnesses and other evidence.

REQUEST          : Under the above reasons, we are asking M/V LIBERTAS to be arrested. 21.05.2008.

Counsel for applicant
Ahmet Sirvan Kilic
Signed